Leroy A. Sugarman v. Commissioner.
Sugarman v. Commissioner
Docket No. 88195.
United States Tax Court
T.C. Memo 1962-186; 1962 Tax Ct. Memo LEXIS 123; 21 T.C.M. (CCH) 1018; T.C.M. (RIA) 62186; August 6, 1962
*123 Petitioner bought a 45 percent interest in a coal lease and stripping agreement from his father and mother for $180,000, the price being fixed by an accountant and an attorney who represented petitioner's father and also rendered services for petitioner, based upon an estimate of the tons of coal available made by an independent engineer. Due to miscalculations of the tonnage of coal available, petitioner did not recover his cost and suffered a loss. Held, loss is deductible by petitioner in 1954. Leonard J. Schwartz, Esq., 1401 Walnut St., Philadelphia, Pa., and J. Victor O'Brien, Esq., for the petitioner. Frederick A. Levy, Esq., for the respondent. DRENNAN Memorandum Findings of Fact and Opinion DRENNAN, Judge: Respondent has determined a deficiency in income tax due from petitioner for the taxable year 1954 in the amount of $47,453.08. The only issue for decision is whether petitioner is entitled to a deduction in 1954 in the amount of $94,892.73 representing a loss sustained on the abandonment of "royalty-yielding mineral rights." Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner was a practicing physician and a resident of South *124 Coatesville, Pennsylvania, during the year 1954. He filed an individual Federal income tax return for the taxable year 1954 with the district director of internal revenue, Philadelphia, Pennsylvania. Mark and Ada Sugarman (hereafter referred to as Mark and Ada) are petitioner's parents, petitioner being their only child. They owned all the issued and outstanding stock of Sewickley Water Company, a Pennsylvania corporation (hereafter referred to as Sewickley), which owned the surface of some 38 acres of land in Westmoreland County, Pennsylvania, on which a reservoir was located. H. C. Frick Coke Company (hereafter referred to as Frick) owned mineral rights underlying this property. In about 1948, Mark discussed with an officer of Frick the possibility of mining the coal underlying the reservoir, which would necessitate moving the reservoir. The officer suggested that Mark employ D. R. Walkinshaw (hereafter referred to as Walkinshaw), a well known registered engineer experienced in making surveys of coal lands in and about Westmoreland County, for this purpose. Following this discussion an agent for Mark contacted Walkinshaw and retained him to take the preliminary steps to make it *125 possible to mine coal underlying the reservoir. Walkinshaw devised a plan to move the site of the reservoir temporarily by building a temporary dam. He obtained the necessary approval of the State authorities to relocate the reservorr and build the dam and also obtained a permit for mine drainage. A permit to build the temporary dam, based on a sketch submitted by Walkinshaw, was issued on May 11, 1949. This sketch was basically a topographical map of the property, which purported to show, among other things, the outcrop line of a seam of coal underlying the surface. On August 11, 1949, Frick, as lessor, and Mark and Ada, as lessees, entered into an agreement by which Mark and Ada were to have the right to mine the Pittsburgh or 9-foot seam of coal which underlay approximately 26 acres of surface, including a part of the Sewickley land and 2 1/2 acres of adjacent surface land owned by one Reese. Frick was to be paid 35 cents per ton mined or lost in mining operations. The area which Mark and Ada were permitted to mine was outlined on a map of the property attached and referred to in the agreement. The map indicated the outcrop line of the coal which was to be mined and showed barrier *126 pillars of coal which were required to be left around the border of the area in order to prevent water from flowing into abandoned mines adjacent to the property. The map indicated that about 4.13 acres of coal would be required for barrier pillars. The agreement provided that it "shall continue in force and be binding upon both parties hereto for a period of thirty (30) days from the date hereof, and thereafter until terminated by default, failure or breach as aforesaid. After the said term has ended, either party may terminate this agreement forthwith by giving to the other party one (1) day's notice * * *." On December 7, 1949, Mark and Ada, trading as M. & S. Sugarman, and Sewickley entered into an agreement with Alva L. Gilleland and Allen C. Gilleland, partners, d.b.a. Gilleland Coke Company (hereafter referred to as Gilleland), which referred to the Frick lease of August 11, 1949, and under which Gilleland agreed to relocate the reservoir, strip mine the coal covered by the Frick lease, leaving the barrier pillars mentioned therein, and, upon completion, to seal off the exposed coal and backfill the area strip mined. Gilleland agreed to pay the Sugarmans as rent or royalty the *127 sum of $1.85 per ton of coal mined and removed, final settlement to be on the basis of the tonnage Mark and Ada had to pay for under the Frick lease. The term of the agreement was 3 years, which could be extended by the parties in writing, but it was provided that if the Frick lease was terminated prior thereto, this agreement would terminate simultaneously therewith. There was attached to and made a part of this agreement photostatic copies of the Frick lease, the map attached thereto, and the various sketches, permits, etc., relating to the reservoir and temporary dam. Prior to 1950, Mark and Ada acquired from Reese the surface rights to the 2 1/2 acres of land which overlay a portion of the 26 acres of coal to be mined by Gilleland. Mining operations were begun by Gilleland under the agreement and prior to December 28, 1950, 4.64 acres of land had been mined and 59,880 tons of coal recovered. Also, an area of 1.46 acres within the 26-acre area proved to be barren of valuable coal. [1] *128 Mark had established a trust for the benefit of petitioner in the early 1940's. In 1949 this trust was terminated and petitioner became the owner of certain real estate, which produced income. Mark was at times in need of cash and, with petitioner's consent, he used income from petitioner's property. Thus, there arose a substantial debt from Mark (or from Mark and Ada's partnership) to petitioner. By the fall of 1950 this debt amounted to over $200,000, and Mark considered transferring to petitioner 45 percent of the interests which he and Ada owned by virtue of the Frick and Gilleland agreements in order *129 to reduce the debt and make cash available to petitioner. Mark at that time managed petitioner's investments, as he does now. Mark discussed the matter in a general way with petitioner, and then told his accountant and his attorney what he proposed to do. The accountant and the attorney told Mark there were tax problems involved in the transaction he proposed: It would be a sale between parents and a son and a gift tax might be incurred if the sale was not considered to be at arm's length. They advised Mark to get a reliable expert's estimate of the recoverable tonnage of coal involved in his contract with Gilleland in order to establish a price, and that he obtain the additional counsel of a lawyer especially familiar with tax matters. Mark had his agent contact Walkinshaw to get the latter's estimate of the tonnage of coal to be mined under the Gilleland agreement. Under date of October 21, 1950, Walkinshaw wrote Mark a letter containing the following statement: I herewith present you with my computation of tons of coking coal which will be extracted from your project in strip mining at the "Mammoth Dam" in Mount Pleasant Township, Westmoreland County, Pennsylvania. 31 acres @ 8 *130 1/2 feet thick = 459,122 tons The Mammoth Dam referred to was the Sewickley reservior dam. Walkinshaw was shown a map similar to the map attached to the Frick agreement, but based his estimate on information and calculations he had made at the time he prepared plans for relocating the reservoir in 1948 which placed the outcrop line some distance outside the outcrop line as shown on the Frick map. He did not reexamine the property in 1950. Walkinshaw was asked by Mark's agent to estimate the tonnage recoverable from the whole area and he based his estimate on the understanding that an area of 26 acres of coal was to be mined under the Sewickley property, plus an area of 5 acres underlying the surface adjacent to the Sewickley property. Walkinshaw estimated that the seam to be mined was 8 1/2 feet thick, based on previous experience with the same seam in the same general vicinity. He used a figure of 14,810 tons per acre, which is a theoretical figure that assumes complete recovery of all coal in a seam 8 1/2 feet thick. Mark gave Walkinshaw's computation to his accountant and lawyers who conferred about it at length. Mark's accountant used it to arrive at a price for 45 percent of Mark's *131 and Ada's interests as follows: According to Walkinshaw's estimate, there were 459,122 tons to be mined. Some 50,000 tons had been mined to the date the conferences took place. Mark and Ada were to receive, net of the payments to Frick and the management fees (25 cents per ton), $1.25 per ton for the roughly 400,000 tons yet to be mined, or a total of $500,000, 45 percent of which was $225,000. The accountant considered that $180,000 would be a fair price. Both Mark and his lawyer were aware that Walkinshaw's estimate was based on a 31-acre area to be mined and that Mark's agreement with Frick called for a 26-acre area, but they felt that if there was an area of 31 acres of coal available, arrangements could be made with Frick for the additional acreage. After discussion between Mark, his lawyer, and his accountant, in which Mark suggested a lower price ($150,000) to give petitioner a larger margin for profit and to reduce his own capital gains tax, the price was fixed at $180,000 when it was pointed out that the gain would be capital gain to Mark and that petitioner could recover his cost against the royalties received, and in view of Mark's acknowledgment that he would not sell the *132 interest to anyone else for less than $180,000. Petitioner, who was then as he is now, a practicing physician, was informed of the price and accepted it upon the advice of the lawyer and accountant who represented him as well as Mark. On December 28, 1950, petitioner entered into an agreement with Mark and Ada which, after references to the Frick lease and the Gilleland agreement and the provisions thereof, provided that Mark and Ada assigned and transferred to petitioner 45 percent of their "right, title and interest in the mineral rights granted by and under the [Frick] Lease" and 45 percent of "all their right in and under the Gilleland Agreement," for a consideration of $180,000. Petitioner was to pay 45 percent of taxes, charges, and expenses, the amount of $0.1575 per net ton mined to Frick, and the amount of $0.1125 per net ton for management and finder's fees. The agreement also provided that in the event Frick terminated the lease within 3 years, or in the event the Gilleland agreement was terminated within 2 years thereafter and Mark and Ada did not obtain someone else to operate the property within 3 months of such termination, then Mark and Ada would pay to petitioner *133 a sum, based on a formula contained therein, calculated to repay petitioner 45 percent of the $1.25 per ton net royalty on the coal remaining to be mined on the property at the time the operations terminated. The sum of $180,000 was credited to the amount owing by Mark and Ada or their partnership to petitioner. No part of the purchase price was paid in cash. During the years 1950 through 1954, 245,537 tons of coal were mined from the property. The mine maps prepared by Frick indicate that all but about 1.2 acres of the leased property was mined prior to September 1953. It was decided that coal under the 1.2 acres would have to be removed by deep-mining methods. In February 1954 mining operations were abandoned because of a determination by a Pennsylvania State Mining Inspector that further mining would be hazardous. For the taxable year 1950, Mark and Ada filed a partnership return showing, as long-term capital gain, the amount of $180,000 received from the sale of "Interest in Coal Stripping Contract." That return also reported an operating loss, after percentage depletion, of $9,403.52, total long-term capital gains of $203,143.81, and total short-term capital losses of $71,240.82, *134 which amounts Mark and Ada also reported on their joint individual income tax return for 1950. In 1952 this joint return was the subject of an examination by an agent of respondent. The amount of gain from the reported sale to petitioner was discussed by the agent with representatives of Mark and Ada, but no adjustment was made with respect to the item. The examination resulted in a deficiency in income tax for 1950, to which Mark and Ada agreed. During the years 1951 through 1953, petitioner reported royalties of $103,752.74 from the mining operations and claimed cost depletion [2] of $85,107.27 on his income tax returns. On his income tax return for 1954 petitioner reported $54.12 income from "Coal Stripping Contract," a net loss of $5,627.62 from his medical practice, net income of $9,997.31 from rents, long-term *135 capital gain from unrelated sources of $191,205.43, and claimed a deduction of $94,892.73 as "Loss on abandonment of royalty yielding mineral rights." In the notice of deficiency which gave rise to this proceeding respondent determined that petitioner was not entitled to the above loss deduction on the stated ground that "it has not been established that you are entitled to the deduction under the Internal Revenue Code of 1954." Opinion Respondent determined that petitioner is not entitled to a deduction in 1954 representing a loss on the abandonment of a 45 percent interest in the rights which his parents owned under the Frick and Gilleland agreements, which 45 percent interest petitioner purportedly bought from his parents in 1950 for a price of $180,000. The burden is upon petitioner to prove facts which would entitle him to the loss deduction claimed, and the amount of it. Burnet v. Houston, 283 U.S. 223 (1931). Thus, he must demonstrate that, from a transaction entered into for profit, he sustained a loss in 1954. [3] *137 The measure of his loss would be his basis in the interest, adjusted for depletion or amortization deductions allowable for the period preceding the loss, secs. 165(b), *136 1011, 1012; [4] see United States v. Ludey, 274 U.S. 295 (1927); in other words, his unrecovered cost in the interests at the date of abandonment. Oliver Iron Mining Co., 13 T.C. 416 (1949). While the evidence presented leaves some doubt in our minds as to some of the other elements required to support the loss deduction in 1954, this case was tried and briefed solely on the theory that the purchase price paid by petitioner for the interest involved was excessive and unrealistic in the light of the facts known at the time, that the purchase lacked economic reality, was not a bona fide transaction at arm's length, and therefore the petitioner is not entitled to deduct any loss. Under the circumstances, we will assume that had the other elements been in issue additional evidence would have been presented with respect thereto and will consider the case on the basis it was submitted. Breitfeller Sales, Inc., 28 T.C. 1164 (1957). Petitioner contends the evidence shows that this was an actual binding agreement between the parties which was carried out according to the terms thereof, that the terms of the agreement, including the price to be paid for the interest, were fair and reasonable judged by the standards of a transaction entered into by parties dealing at arm's length, *138 that the price agreed upon was determined by his accountant and attorney based upon an estimate of the tonnage to be recovered, made by a competent independent engineer, multiplied by the fixed net royalty, which if accurate would have provided him with a profit, and that he incurred a loss, measured by the difference between the price he paid and the cost depletion he had claimed, when the venture was abandoned in 1954. We agree with petitioner that on the record before us he has made a prima facie case for allowance of the loss deduction claimed. The agreement between petitioner and his parents was reduced to writing and signed by both parties and appears to be legal and binding on its face. The only evidence presented on the point is that the stated consideration of $180,000 was paid to Mark and Ada by petitioner by crediting their indebtedness to him with $180,000, and respondent does not appear to question that the stated consideration was paid. It was stipulated that the mining operations were abandoned in February 1954 because of a determination by a Pennsylvania State Mining Inspector that further mining would be hazardous, and in the absence of evidence or argument to the *139 contrary we accept this as proof that the loss, if any, occurred in 1954. It is also stipulated that petitioner actually reported (and, we assume, received) royalties under the agreement of $103,752.74 during the calendar years 1951 through 1953, and claimed cost depletion of $85,107.27. There does not seem to be any question raised that the amount of the loss claimed is the correct amount if the stated consideration of $180,000 is to serve as petitioner's unadjusted basis in the asset and the price was not so unrealistic as to justify ignoring the entire transaction for tax purposes. Mark and Ada actually reported the $180,000 purchase price as capital gain in 1950 and paid tax thereon, although the gain was admittedly offset to a considerable extent by a short-term capital loss. On the above evidence we cannot say the transaction was a sham. It appears to have had substance and to have been carried out in accordance with the terms thereof. While it is true that transactions between related parties may require close scrutiny, Donald McDonald, Jr., Administrator, 28 B.T.A. 64 (1933), it is also true that related parties may deal with each other and, absent some specific provision *140 of the law providing otherwise, see sec. 267, their transactions will be recognized for tax purposes if the resulting arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length. Stearns Magnetic Mfg. Co. v. Commissioner, 208 F. 2d 849 (C.A. 7, 1954), reversing a Memorandum Opinion of this Court; Sun Properties v. United States, 220 F. 2d 171 (C.A. 5, 1955); Differential Steel Car Co., 16 T.C. 413 (1951). The only real argument between the parties is whether the purchase price was so excessive and unrealistic in the light of the facts known at the time as to require a conclusion that the transaction was not bona fide and had no economic reality; or that the purchase price does not constitute petitioner's unadjusted basis for computing gain or loss. Where the price paid for property, particularly in transactions between related parties, was so manifestly excessive that it appeared impossible for the purchaser to make a profit, losses have been disallowed either because it was concluded that the taxpayer could not have entered the transaction for profit, Dresser v. United States, 55 F. 2d 499 (Ct. Cl. 1932), certiorari *141 denied, 287 U.S. 635 (1932); or because the price paid was considered to have been paid for something other than the assets received, Mountain Wholesale Co., 17 T.C. 870 (1951), Majestic Securities Corporation, 42 B.T.A. 698 (1940), affd., 120 F. 2d 12 (C.A. 8, 1941), and did not represent the basis in the assets acquired, Pennsylvania Indemnity Co., 30 B.T.A. 413 (1934), affd., 77 F. 2d 92 (C.A. 3, 1935), certiorari denied 296 U.S. 588 (1935); or because, due to the relationship of the parties and the absence of any true purpose behind the transaction except tax avoidance, the loss claimed was lacking in finality. Crown Cork International Corporation, 4 T.C. 19 (1944), affirmed per curiam, 149 F. 2d 968 (C.A. 3, 1945). But on the evidence here we cannot conclude that the price paid by petitioner for a 45 percent interest in the Frick and Gilleland contracts was so manifestly excessive to the parties at the time as to bring the transaction within the ambit of any of the above cases. Admittedly this was not a transaction between parties dealing with each other at arm's length. Petitioner apparently did not participate himself in fixing the price and there was no bargaining *142 between the parties - petitioner accepted the price determined to be fair by the accountant and attorney. We think it is also obvious that no one with experience in the coal business and having all the known facts at hand, would have agreed to pay $180,000 for a 45 percent interest in the net royalties to be produced from the coal estimated to be remaining under the property covered by the Frick lease without at least some analysis by himself or his own consultants. On the other hand, petitioner knew nothing about coal mining or about investments. He relied upon his father in these matters and when his father told him that, because of their relationship, the price would have to be fixed by the accountant and the lawyer, we cannot say that it was manifestly unreasonable for petitioner to accept their judgment. So far as the excessiveness of the price itself is concerned, we think it is just as reasonable to conclude that it resulted from carelessness on the part of those whose responsibility it was to fix the price as to conclude that the price was deliberately made excessive for tax purposes or some other reason. Mark employed an engineer who was thoroughly familiar with the area *143 to estimate the tonnage of coal that could be removed from the leased property. The engineer, either because he was not given proper instructions by Mark's agent or because he misinterpreted the instructions, gave an estimate of the tonnage underlying the 26 acres under lease and 5 adjacent acres which he thought were to be included. The attorney recognized that the acreage used by the engineer was too great but did not bother to have it reestimated because, based on his previous experience in such matters, he felt that if there was coal available under the excess acreage, arrangements could be made with Frick and others to mine it. The accountant accepted the engineer's estimate as a starting point in computing a reasonable price and, after making allowance for coal previously mined, arrived at the actual royalty that would be received on the estimated tonnage remaining, and then discounted it approximately 20 percent, whether for a profit margin or some other reason we do not know, to arrive at the $180,000 figure. Mark thought a lower figure should be used to give his son a better margin and to reduce his own capital gains tax but agreed to the price after discussing it with the *144 accountant and attorney. Provision was made in the agreement for the protection of petitioner, by repayment to him for unmined coal, in the event the Frick or Gilleland contracts were terminated before a reasonable time. It must be recognized that had all the miscalculations been brought together and had it been known definitely that the stripping operation would be limited to the area covered by the Frick lease, it should have been apparent that the price agreed upon was excessive. But we cannot conclude that under these circumstances the excessiveness of the price was so manifest to either petitioner or Mark that the price paid can be said to have been for something other than the interest transferred. Respondent argues that the price was fixed from tax considerations alone and had no relationship to the actual value of the interest transferred. While it is recognized that a taxpayer may arrange his affairs in a manner best suited to save taxes, and that genuine transactions will be given full effect even though they were undertaken for the purpose and have the result of avoiding taxes, Gregory v. Helvering, 293 U.S. 465 (1935), Gouldman v. Commissioner, 165 F. 2d 686 (C.A. 4, *145 1948), affirming a Memorandum Opinion of this Court, we agree with respondent that if the price fixed in this agreement was based on tax considerations alone and was not genuinely intended to reflect a fair and reasonable price for the asset transferred, the stated price could be ignored in determining petitioner's right to the deduction for this loss. But the evidence does not support respondent's contention - it is based only on suspicion and we cannot decide cases on suspicion alone. Differential Steel Car Co., supra.The suspicion is that it was beneficial taxwise for Mark and Ada to place as high a price as possible on the interest sold so they could report it as capital gain, and incidentally offset it in part at least by a capital loss, while petitioner could recover his cost from the royalties received taxfree. This would appear to assume that petitioner would at least recover his cost - which is contrary to respondent's principal contention. Otherwise, there would be no benefit taxwise in having Mark and Ada pay tax on a larger capital gain which would produce a large loss to petitioner that he could take advantage of only if his income increased enough to offset it. As *146 it turned out petitioner did have enough income from a large capital gain in 1954 to offset the loss, but there is no evidence that this could have been foreseen in 1950. Furthermore, if the price was knowingly and arbitrarily fixed too high, it would necessarily result in an economical loss to petitioner if the transaction was carried out. While it might be argued that because of the relationship between the parties, petitioner would not suffer an actual economic loss, such a surmise, without any evidence to support it, would not justify ignoring the separate identity of the parties for tax purposes. Decision will be entered for the petitioner. Footnotes
1. The outcrop line of the coal was below the surface of the water in the reservoir as originally located. It appears from a mining map prepared by Frick in July 1950 that Gilleland began stripping before June 30, 1950, and that the actual outcrop line could have been determined by that date. The outcrop line is shown on this map in about the same location as it appeared on the map attached to the Frick lease, which is some distance inside the outcrop line as located by Walkinshaw and referred to later. The barren area of 1.46 acres referred to above lies between the outcrop line as shown on the Frick map and the first salable coal mined by Gilleland. Of course that area was not entirely barren of coal but because of erosion the seam was thin and the coal was not of salable quality.
2. This is the term to which petitioner and respondent have stipulated, but petitioner's counsel indicated that the term is incorrect. Whether the total amount claimed by petitioner represented "cost depletion" or merely application of cost against receipts, it seems agreed by the parties that petitioner recovered, prior to 1954, $85,107.27 of his claimed cost in the property.↩
3. Section 165, I.R.C. 1954, provides: (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * Petitioner was a practicing physician, and he makes no contention that the claimed loss deduction was incurred in his trade or business. 4. Statutory references herein are to the Internal Revenue Code of 1954 unless otherwise noted.↩