**STEARNS MAGNETIC MFG. CO.**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**COMMISSIONER OF INTERNAL REVENUE**

v.

**STEARNS (two cases).**

**No. 10863–10865.**

United States Court of Appeals Seventh Circuit.

Jan. 7, 1954.

Louis Quarles, Edmund B. Shea, Milwaukee, Wis., Percy W. Phillips, Washington, D. C., for Stearns Magnetic Mfg. Co.

H. Brian Holland, Asst. Atty. Gen., Melva M. Graney, Ellis N. Slack, Lee A. Jackson, Sp. Assts. to the Atty. Gen., for Commissioner of Internal Revenue.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

We have heretofore directed that these three petitions to review decisions of the Tax Court, filed under Section 1141(a) of the Internal Revenue Code, 26 U.S.C.A. § 1141(a), be consolidated for hearing and decision. In the first, the corporate taxpayer, Stearns Magnetic Manufacturing Company, attacks a decision that certain royalties paid by it in the years 1943, 1944 and 1945 for the use of a patent owned by its two stockholders and leased to it were not allowable as deductions in determining its taxable income. In the other two, the Commissioner seeks review of decisions with reference to alleged deficiencies in the stockholders' income taxes for the year 1943, as a result of their receipt of a corporate dividend in that year.

The company operates a relatively small manufacturing business in Milwaukee. The individual taxpayers, Roswell H. Stearns and Roswell N. Stearns, father and son, respondents in the two causes wherein review is sought by the Commissioner, own all the capital stock of the corporation in equal parts and constitute its only officers. The company originally manufactured only magnetic separation equipment, heavy machinery, which was usually built to order and for production of which its plant was specially designed. In 1936 it began producing magnetic brakes under what is known as the Kiekhaefer patent, which it owned by virtue of an assignment from the inventor, one of its employees. These brakes are small appliances produced by mass assembly-line operation and are sold in comparatively large lots to manufacturers of electric motors. Their production in the company's own plant proved uneconomic, for the reason that its factory was not adapted to profitable manufacture of this type of device, which was alien to its regular business. Finding that it could purchase the brakes from one adequately equipped for such production at less cost than it could make them for itself, the corporation, after 1938, had them manufactured by another firm but marketed them. The company's business, insofar as brake sales were concerned, resulted in substantial losses in each of the years 1938, 1939 and 1940. In 1941, for the first time, the operation resulted in a profit, $6,060. Upon intervention of the Second World War, demand for brakes increased until in 1942, the company realized a profit on their sale of $29,701.

In earlier negotiations looking to a merger with another company in Milwaukee, the stockholders had found that the brake business was not marketable. Furthermore, whether it would be prosperous in the future apparently depended largely upon whether the war persisted. Accordingly, in view of the fact that it then seemed probable that a merger might eventually take place, which both companies deemed desirable because of the resultant saving in advertising and marketing, the stockholders, desiring to preserve any potential value the patent might prove to have in the future, according to the undisputed testimony, conceived the idea that they would have it delivered to themselves as a corporate dividend and then see what they could do with it by way of individual ownership. The corporation was solvent and making money. The stockholders made no attempt to determine whether, if they received the patent as a dividend, the aggregate taxes of the corporation and themselves would be increased or decreased. As a result of their consideration of the problem and their consultation with others, they ultimately evolved a plan whereby a corporate resolution was adopted authorizing assignment of the patent to the two as a dividend in kind. In return, the stockholders entered into a nonexclusive license agreement with the corporation, to run for a year, with the op-

tion of further extension and the right in each party to cancel upon notice. Under this agreement, the company agreed to pay to the owners of the patent, ten per cent of the gross sales of brakes manufactured and sold under it.

In the years 1943, 1944 and 1945, apparently due to the war demand, the sale of brakes, which the corporation continued to have made by another company, increased, with the result that substantial royalties became due and were paid to the owners as follows: in 1943, $33,000; 1944, $49,000 and in 1945, $54,000. The net profit to the corporation realized from the sale of brakes exceeded the royalties paid. These fees were properly accounted for by the licensors as income in their individual income tax returns. However, being of the opinion that the patent was only of problematical, speculative value at the time when they received it as a dividend, they did not report its receipt as income, and the testimony is persuasive that at that time the patent had only a conjectural value which might disappear over night. In this situation, the Commissioner does not claim there was any fraud or improper concealment of the receipt of the dividend. He levied an assessment against the corporation for deficiencies on the ground that the royalties paid were not properly deductible as ordinary and necessary expense in the conduct of the corporate business. Inconsistently he levied an additional assessment against the individuals for the value of the dividend which they had received, that is, the patent, which he asserted was $500,000. The taxpayers, finding themselves unable to obtain money with which to pay the additional assessments, prosecuted their cases through the Tax Court. That court upheld the Commissioner's position that the royalties were not deductible as expenses in the corporate taxpayer's business and, in this view of the case, did not approve the deficiency levied against the two individuals. Apparently, this decision was based on the theory that the declaration of the dividend was a sham and that the stockholders were not entitled to the royalties.

The question presented upon the corporate tax is whether the court erred in deciding that the royalties paid by the corporation for use of the patent were not deductible under Section 23(a) of the Internal Revenue Code, 26 U.S.C.A. § 23(a), as ordinary and necessary expenses of the taxpayer's business. The issue as to the two stockholders is whether the Tax Court erred in failing to determine the value of the patent at the time of its distribution as a dividend and in failing to approve deficits in their taxes for 1943 based on their receipt of the dividend. The taxpayers concede that the value of the dividend should have been determined and that they should have been charged with its value as income. The Commissioner's position is that if this court should reverse the decision on the business expense of the corporate taxpayer, then the cases as to the individual taxpayers should be remanded for inclusion in their taxable income of the fair market value of the patent in 1943, pursuant to Section 115 (j) of the Internal Revenue Code, 26 U.S.C.A. § 115(j).

It is perfectly obvious from the facts related that on its face the transaction was legal and valid. The corporation was solvent; it had a right to declare a dividend and did so; thereby the stockholders received the patent as a dividend in kind. The assignment was not concealed but was filed of record with the Patent Office. In return, they licensed the corporation to sell the device upon payment of royalties. No other parties were affected. No injury was inflicted upon any creditor or stockholder, but the entire transaction on its face was, in the absence of nullifying circumstances, valid and reasonable. Consequently, unless the declaration of the dividend and the delivery of the patent to the stockholders can be ignored, because of other evidence, as a sham or pretense, the royalties paid under its contract were necessary and ordinary expenses of the corporation in its business of

manufacturing the device at a substantial profit during the years involved.

After careful consideration of all the facts involved, we find no evidence which justifies us in holding that this transaction between the sole stockholders and the corporation, was anything other than reasonable or in labeling it as anything other than one made in good faith. As we have observed, no creditor or stockholder was adversely affected. The corporation declared a dividend, as it might well do. Thereupon the patent became the property of the stockholders, who, as owners, had a right to and did license the corporation upon a royalty basis and later still another company, as the original grant to the corporate taxpayer was not exclusive. The transaction being valid, the royalties paid in pursuance thereof were ordinary and necessary expenses imposed upon the corporate defendant in its business of manufacturing and selling the devices.

■ Individuals who own all the capital stock of a corporation are not by reason of that relationship disqualified from contracting with the corporate entity. An agreement between a corporation and its sole stockholders is valid and enforcible, if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length. This is recognized by the Bureau of Internal Revenue in official rulings, O.D. 440 C.B. June 1930, p. 215, by the Tax Court, Webb Press Co., Ltd., 3 B.T.A. 247, and by the courts of review. Commissioner of Internal Revenue v. Thomas Flexible Coupling Co., 3 Cir., 198 F.2d 350; A. & A. Tool & Supply Co. v. Comm. of Internal Revenue, 10 Cir., 182 F.2d 300; J. H. Robinson Truck Lines v. Comm. of Internal Revenue, 5 Cir., 183 F.2d 739. The undisputed evidence is that the patent at the time of the declaration dividend, had no market value but only a speculative value and that, though people might have been found who would have taken a license for manufacture of the brakes, there was no one who would buy the patent. The devices to be made under it were not a part of the ordinary business of the corporate taxpayer, who had farmed out the manufacture of the device to another. The undisputed evidence is also that the royalty was entirely reasonable.

■ We are not concerned with whether the declaration of the dividend resulted in benefit to the company. Dividends are declared for the benefit of the stockholders and, if the corporation is solvent, they are justified. The test is not whether the dividend eventually furthered the corporate business purposes or not but rather whether the license agreement requiring the payment of royalties was reasonable. Chamberlin v. Comm. of Internal Revenue, 6 Cir., 207 F.2d 462 at page 469.

■ Nor is the fact that a tax saving was realized proof of bad faith. A taxpayer is free to adopt any form of legal organization for the conduct of his financial affairs he may choose; he may convert from the corporate set-up to that of a partnership or vice versa. Though his motive in so doing is to reduce taxes, the conversion must be accorded recognition unless it is such a sham, such a change in form only, without substance, as to require that it be disregarded for tax purposes. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S. Ct. 532, 90 L.Ed. 670; Twin Oaks Co. v. Comm. of Internal Revenue, 9 Cir., 183 F.2d 385. If the parties deal fairly with one another, it matters not whether their aim be, as the Second Circuit said, "to avoid taxes or to regenerate the world." Chisholm v. Comm. of Internal Revenue, 2 Cir., 79 F.2d 14, 15. To quote again from that circuit, from Helvering v. Gregory, 2 Cir., 69 F.2d 809, 810, a transaction does not lose its immunity "because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase

one's taxes." See also Tilden Inc. v. Comm. of Internal Revenue, 5 Cir., 192 F.2d 704; Comm. of Internal Revenue v. Clark, 7 Cir., 202 F.2d 94; Chamberlin v. Comm. of Internal Revenue, 6 Cir., 207 F.2d 462 at page 468.

In his attempt to sustain the decision that the transaction should be ignored, the Commissioner relies upon the decision of this court in Ingle Coal Corp. v. Comm. of Internal Revenue, 7 Cir., 174 F.2d 569. We think the facts in that case are inapposite to those here. We pointed out, as the grounds for our decision there, that the stockholders took from one corporation all its assets and delivered them to a second, the only result being that the royalty which the first was bound to pay, was increased, whereas the new corporation merely took the place of the old one. The stockholders acted merely as a conduit of title from one wholly owned corporation to another and thereby added to their collections from the first corporation. For all practical purposes the new corporation was the same old company. Accordingly we held that the whole transaction was a shifting device without substance, which should be ignored. The present case comes more nearly within the reasoning of our decision in Skemp v. Comm. of Internal Revenue, 7 Cir., 168 F.2d 598. There the taxpayer had conveyed certain property which he had previously owned to an irrevocable trust, the beneficiary of which was his wife. The trustee thereupon leased the property back to the taxpayer. Inasmuch as all the transactions were valid, without injury to any one, we held that the rental which the taxpayer had to pay the trustee was a deductible business expense. In accord with our holding there, the conveyance to the sole stockholders here, with a license back under which the royalties became due, stands as a bona fide transaction. As there the granting taxpayer irrevocably divested itself of all title and had a right to enjoy the property thereafter only upon payment of a reasonable rental. See also

Consolidated Apparel Co. v. Comm. of Internal Revenue, 7 Cir., 207 F.2d 580; Commissioner of Internal Revenue v. Greenspun, 5 Cir., 156 F.2d 917; Brown v. Comm. of Internal Revenue, 3 Cir., 180 F.2d 926.

We think the reliance of the Commissioner upon other cases cited is misplaced. Thus, in Armston v. Comm. of Internal Revenue, 5 Cir., 188 F.2d 531, the rental payments were not deductible because the corporation's ownership had not been completely divested by the alleged sale, which the court declared a sham. In White v. Fitzpatrick, 2 Cir., 193 F.2d 398, the court found the payments nondeductible because the taxpayer himself was the real owner.

We conclude that there is nothing in the record to impeach the validity of the declaration of the dividend of the corporation, or the license made by the owners of the patent to the corporation and that the royalties payable under the license were necessary expenses required to be paid by the corporation within the meaning of the statute and should have been allowed as deductions by the Commissioner.

From what we have said it is obvious that the individual stockholders who received the dividend should account for the reasonable market value thereof as income in the year in which it was received. The evidence most favorable to the Commissioner is that the fair cash market value of the patent at the time it was delivered to the stockholders was not more than $60,000. Viewing the evidence in this respect in its phases most favorable to the Commissioner, we find the value to have been $60,000. Consequently each of the taxpayers should account for $30,000 thereof as income, less the amortization applicable to patent rights under the statute and pertinent regulations.

Accordingly the judgments are reversed and the cases remanded to the Tax Court for proceedings consistent with the views herein expressed.