OPINION. Hakron, Judge: In the joint returns of the petitioners for 1951 and 1952, receipts from National under the two exclusive license agreements were reported in the total amounts of $53,739.84 and $38,367.54, respectively, and were treated as long-term capital gains of which 50 per cent was taxable. The Commissioner determined in the statutory deficiency notice that the above receipts were not long-term capital gains within the purview of section 117, subsections (a), (b), and (c), 1939 Code, and that therefore the entire amounts of the receipts were subject to tax. The respondent contends that either the two exclusive license agreements were a fiction, a sham, and not what they purported to be, or that they were only licensing agreements as distinguished from sales of all of the substantial rights of Champayne in the two patents involved. If either of the Commissioner’s contentions is correct, it would follow that the payments under both agreements, which Cham-payne received in the taxable years 1951 and 1952, would be taxable in full. The respondent’s first contention, if sustained, will result in a determination that the payments in question represented distributions of earnings of National, taxable as dividends. Respondent makes another contention which is related to his contention that both agreements were a fiction and should not be recognized as what they purport to be. This additional contention is that the 20 per cent rate of payments prescribed in the Two Pad sanding machine agreement was excessive. This contention must be considered along with the question whether either both agreements were or the Two Pad sander agreement was a fiction and a sham. If, however, it is held that the Two Pad sander agreement was a bona fide, arm’s-length agreement, respondent’s additional contention takes on another aspect which is that the 20 per cent rate was excessive to the extent of 15 per cent which part, respondent argues, represented a distribution of earnings of National taxable as dividends. We shall first consider the question whether either or both of the exclusive license agreements was or were a fiction and lacking in bona fides. The owner of the patent on the Mity Midget and of the patent applications on the Two Pad sander, Champayne, owned 50 per cent of National’s stock, his wife owned 25 per cent, and Dayton owned 25 per cent at the time the Mity Midget agreement was executed by Champayne. When the Two Pad agreement was executed, Cham-payne owned 66.67 per cent, and Ms wife owned 33.33 per cent of National’s stock. There was, therefore, at both times control of National through stock owned by either Champayne and his wife or by Champayne. TMs relationship of the owner of the patent and patent application (which are referred to hereinafter, for convenience, as the patents) to National requires close scrutiny of both agreements and the circumstances under which they were made. In deciding this question both the bona tides of the transactions and the reasonableness of the amounts of the payments to Champayne under the agreements require consideration. Cf. Granberg Equipment, Inc., 11 T. C. 704; Differential Steel Car Co., 16 T. C. 413. Respondent’s arguments have been carefully considered together with the entire record. It is recognized that in a situation such as the one before us, where the principal stockholder of a corporation also owns a patent and receives payments out of the sales of the patented article, it is possible for a transaction involving such payments to give rise to suspicion. But, as has been said before, tax issues cannot be decided on suspicion; they must be decided on the facts of each particular case, taking into account the burden of proof, if any, which may be upon the taxpayer or upon the respondent, as the case may be. The findings wMch have been made dispose of this question. Upon the entire record, we would not be justified in disregarding the separate entity of the corporation, National, which is legally recognized as distinct from the individuals who are the stockholders, simply because Champayne was dealing with a corporation in which he and his wife, or he alone, owned the controlling shareholdings. “An agreement between a corporation and its sole stockholders is valid and enforceable, if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm’s length.” Stearns Magnetic Mfg. Co. v. Commissioner, 208 F. 2d 849, 852. Furthermore, it was entirely permissible for Champayne to grant to a corporation which was equipped to manufacture the items, either exclusive licenses or mere licenses, provided the transactions were bona fide. Such transactions are common in business and commercial practice. We are satisfied that the agreements with National had a business purpose. Both of the patented tools were valuable; they incorporated original conceptions worthy of receiving patents, they were items requiring manufacture and sale. Champayne had the right to transfer the patents to the manufacturing and selling corporation if he desired to do so, as he did. We do not have here a great disparity between the dividends paid by the corporation, National, and the amounts of the payments under the agreements. For example, the total amount of dividends paid in 1951 and 1952 amounted to $32,175 in each year; and the total payments under the two agreements amounted to $53,739.84 and $38,-367.54 in 1951 and 1952, respectively. The evidence establishes clearly that the 5 per cent rate of payments under the Mity Midget agreement was a normal rate for the type of tool involved, and that it was a reasonable rate. The evidence shows also that there was a good business reason for the lower, graduated rates under this agreement during its first 5 years, namely, a forbearance on Champayne’s part to enable National to become financially established. We are satisfied that the graduated rates, up to 5 per cent, did not constitute a device for distributing earnings of National to Champayne in the guise of “royalties.” With respect to the 20 per cent rate under the Two Pad sander agreement, there is evidence that rates as high as 20 and 22 per cent are adopted in exclusive license agreements. Later, we shall consider the question of the reasonableness of the 20 per cent rate, but in connection with its relationship to the bona fides of the agreement, it is concluded that the adoption of a rate of 20 per cent is not sufficient reason for concluding that the Two Pad sander agreement was not an arm’s-length, bona fide agreement. Champayne believed that because of the value of his invention, the rate of 20 per cent of net sales was a reasonable rate. Other arguments of the respondent are of little merit. For example, we are satisfied that National did not have “shop rights” in either invention, but, if it did, that factor would not prevent the granting of greater rights to National under the agreements in question, and would not make the agreements a sham and fiction. Also, the fact that National did not sign the agreements does not make them lacking in bona fides or ineffective. It is readily apparent from each “exclusive license” that the contract of the parties was not dependent on mutual promises. The terms of Champayne’s offer were clearly spelled out in the “exclusive license.” National accepted these terms when it made use of the inventions, and it became obligated to pay the royalties when it was paid in full by its customers. Cf. 1 Restatement, Contracts sec. 52. It is concluded that both of the exclusive license agreements were bona fide and arm’s-length agreements. Under this issue, respondent’s contentions are rejected. The next issue is whether the payments received under the agreements are payments for the patents and taxable as long-term capital gains. Respondent does not contend that the patents were not capital assets of Champayne at the time each agreement was executed. The petitioners rely primarily upon Waterman v. Mackenzie, 138 U. S. 252, and also upon the following: Edward C. Myers, 6 T. C. 258; Kimble Glass Co., 9 T. C. 183; Halsey W. Taylor, 16 T. C. 376; Vincent A. Marco, 25 T. C. 544; Kronner v. United States, 110 F. Supp. 730; Commissioner v. Hopkinson, 126 F. 2d 406; Commissioner v. Celanese Corp., 140 F. 2d 339; Allen v. Werner, 190 F. 2d 840; United States v. Carruthers, 219 F. 2d 21. In Vincent A. Marco, supra, this Court said: It is now well established by tbe weight oí authority that the grant of the exclusive right to manufacture, use, and sell a patented article constitutes a sale of the patent rights with the proceeds taxable as long-term capital gain, provided (1) the invention constitutes a capital asset in the hands of the grantor, and (2) it was held by the grantor for the required period. Proceeds from such a grant constitute long-term capital gain income whether payment is made in a lump sum or over a period of years based on the use of the invention by the grantee. This was what we held in Edward C. Myers, 6 T. C. 258. That case has been frequently cited and followed by us. In our decision in that case, we based it largely on the Supreme Court’s decision in 'Waterman v. Mackenzie, 138 U. S. 252. This latter case * * * did deal with the question as to when a patent agreement amounted to a mere license and when it amounted to a sale. The principle stated in the Marco case has been restated recently in Watson v. United States, 222 F. 2d 689, 690: It is a firmly accepted principle of law that if the patentee conveys by an instrument in writing the exclusive right to make, use, and vend the invention throughout the United States, or an undivided part or share of that exclusive right, or the exclusive right under the patent within a specified area within the United States, the conveyance constitutes ah assignment of the patent, complete or partial as the case may be; and that a transfer short of that is not an assignment but a license. Waterman v. Mackenzie, 138 U. S. 252, 11 S. Ct. 334, 34 L. Ed. 923; United States v. General Electric Co., 272 U. S. 476, 47 S. Ct. 192, 71 L. Ed. 362; Doherty Research Co. v. Vickers Petroleum Co., 10 Cir., 80 F. 2d 809, certiorari denied 299 U. S. 545, 57 S. Ct. 9, 81 L. Ed. 401; Broderick v. Neale, 10 Cir., 201 P. 2d 621. * * * The reasoning in support of this principle is that by the terms of a United States patent a patentee receives, for a term of, 17 years, the exclusive right to make, use, and vend the invention in the United States, and when the patentee “transfers all of these rights exclusively to another, even though he calls the instrument a license rather than an assignment, he transfers all that he has by virtue of the patent and the transfer amounts to a sale of the patent.” Kimble Glass Co., supra, pp. 189, 190. The evidence establishes that Champayne intended to give .National and National wanted exclusive licenses to make, use, and sell both of the patented tools. We disagree with respondent’s argument to the contrary. Applying the principles enunciated in the authorities cited above, it is held that each agreement was an exclusive license agreement under which Champayne transferred his “whole” right in each patent to National; the agreements amounted to sales of the patents involved. It follows that the payments by National under the agreements were payments of the purchase prices and that they constituted long-term capital gains to Champayne. Switzer v. Commissioner, 226 F. 2d 329, on which respondent relies is distinguishable. On the matter of the 5 per cent payments under the Mity Midget agreement, we find that the rate was reasonable and normal. Respondent actually does not contend to the contrary. There remains the question whether the 20 per cent rate under the Two Pad agreement was a reasonable rate. Under this question petitioner has the burden of proof. He has failed in part in his burden of proof. We are satisfied from the evidence that 5 per cent of net sales is a reasonable rate of payment for the patent rights, and have so held. Jt is held that 15 per cent of National’s payments under this agreement represented distribution of earnings of National which are taxable to Champayne as dividends. Decision will be entered wider Bule 50