T.C. Memo. 1996-323


UNITED STATES TAX COURT


LYNNDA SPEER, DONOR, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 6626-94, 6627-94,          Filed July 16, 1996.
            6628-94.


Michael David Annis, Jeffrey M. Dean, John H. Rains III,

James A. Bruton, III, John D. Cline, and Ari S. Zymelman, for

petitioners.

Francis C. Mucciolo and Stephen R. Takeuchi, for respondent.

_____

[1]Cases of the following petitioners are consolidated
herewith:  Roy M. and Lynnda L. Speer, docket No. 6627-94, and
Roy M. Speer, Donor, docket No. 6628-94.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income and gift taxes and additions to tax as follows:

Lynnda Speer, Donor
Gift tax - docket No. 6626-94

| Year | Deficiency |
|------|------------|
| 1990 | $625,702 |

Roy M. and Lynnda L. Speer
Income tax - docket No. 6627-94

| Year | Deficiency | Additions to Tax Sec. 6653(a)(1) | Sec. 6661 | Accuracy-Related Penalty Sec. 6662(a) |
|------|------------|-----------------|-----------|-----------------------|
| 1988 | $530,514 | $26,526 | $132,629 | -- |
| 1989 | 774,565 | -- | -- | $131,189 |
| 1990 | 1,424,760 | -- | -- | 175,653 |

Roy M. Speer, Donor
Gift tax - docket No. 6628-94

| Year | Deficiency | Sec. 6651(a)(1) |
|------|------------|-----------------|
| 1985 | $9,643 | $2,411 |
| 1986 | 233,720 | 58,430 |
| 1987 | 1,103,590 | 275,898 |
| 1988 | 1,344,161 | 336,040 |
| 1989 | 1,444,955 | 361,239 |
| 1990 | 996,254 | -0- |

After concessions, the issues for decision are: (1) Whether petitioner Roy M. Speer, the controlling shareholder of Home Shopping Network, Inc., received constructive dividend income as

a result of payments made by Home Shopping Network, Inc., to Pioneer Data Processing, Inc., pursuant to a license agreement; (2) if so, whether amounts equal to these license payments constituted taxable gifts to petitioners' son, Richard M. Speer, who owned all the stock of Pioneer Data Processing, Inc.; (3) whether petitioners' claimed losses from two subchapter S corporations during the taxable years 1988 through 1990 are passive activity losses as defined in section 469;[2] (4) whether petitioners are liable for the addition to tax for negligence under section 6653(a)(1) for the taxable year 1988; (5) whether petitioners are liable for the accuracy-related penalty under section 6662 for the taxable years 1989 and 1990; (6) whether petitioners are liable for the addition to tax for a substantial understatement of tax liability under section 6661(a) for the taxable year 1988; and (7) whether petitioner Roy M. Speer is liable for additions to tax under section 6651(a)(1) for failure to file a timely gift tax return for the taxable years 1985 through 1989.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the first, second, third, and fourth

_____

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

supplemental stipulations of facts are incorporated herein by this reference.

At the time of filing the petitions in these consolidated cases, petitioner Roy M. Speer resided in Freeport, Grand Bahamas, in the Bahamas, and petitioner Lynnda L. Speer resided in New Port Richey, Florida. Petitioners filed joint U.S. Individual Income Tax Returns (Forms 1040) for the taxable years 1988 through 1990. Petitioner Roy M. Speer filed a U.S. Gift (and Generation-Skipping Transfer) Tax Return (Form 709) for the taxable year 1990. Petitioner Lynnda L. Speer also filed a Form 709 for the taxable year 1990. Petitioners elected to split their gifts pursuant to section 2513 for the taxable year 1990.

## Constructive Dividend Issue

Pioneer Data Processing, Inc. (Pioneer), was incorporated under the laws of the State of Florida in August 1978.[3] When Pioneer was originally incorporated, petitioner Roy M. Speer (Mr. Speer) was the president and a shareholder. On July 1, 1981, Mr. Speer transferred all the stock of Pioneer to Robert L. Cox, Mr. Speer's insurance agent, and resigned as president of Pioneer. Mr. Cox became president of Pioneer. On March 7, 1984, Mr. Cox

_____

[3]Pioneer was originally incorporated under the name Pasco Data Processing, Inc. Pioneer subsequently merged with Western Hemisphere Sales, Inc., a Florida corporation, in August 1991. In the merger, Pioneer was the surviving corporation and changed its name to Western Hemisphere Sales, Inc. For convenience, the surviving corporation will hereinafter be referred to as Pioneer.

transferred all the stock of Pioneer to Richard M. Speer, petitioners' son, whereupon Richard M. Speer became president of Pioneer. Since the time Mr. Cox transferred the Pioneer stock to Richard M. Speer, Richard M. Speer has been the sole shareholder and president of Pioneer.

Home Shopping Channels, Inc. (HSC), was incorporated in 1981 under the laws of the State of Florida to conduct a business consisting of selling merchandise at retail prices through televised programs in the Tampa Bay, Florida, area. HSC was cofounded by Mr. Speer and Lowell W. Paxson. Approximately 51 percent of the stock of HSC was owned by Richard W. Baker, as trustee of the Roy M. Speer Trust. The remaining stock was owned by Mr. Paxson, as trustee of the Barbara A. Paxson Trust, and approximately 10 other shareholders.

Pioneer created and developed financial accounting computer software programs to assist customers in maintaining their general ledgers, accounts payable systems, and payroll systems. Pioneer provided such financial accounting software and related data processing assistance to HSC beginning in 1982. Other customers of Pioneer included a construction company, a utility company, and an oil and gas company.

In early 1982, Pioneer retained Harris Data, Inc. (Harris Data), to assist in the development of a customized computer software program, which would include customer maintenance, order taking, and inventory control programs (the Local Software) for

HSC.  John Pfeiffer was the programmer from Harris Data who was assigned to work on this project.  Mr. Speer and Mr. Paxson assisted Mr. Pfeiffer by describing the logic and flow of information necessary for the business of HSC.  Mr. Pfeiffer used this information to create and develop the Local Software in RPG II computer language, which was to be run on Pioneer's IBM System 34 computer.  Mr. Pfeiffer subsequently joined Pioneer as a full-time employee on June 1, 1982, where his primary responsibilities consisted of the continued development of the Local Software.  Although Pioneer billed HSC monthly for the programming and services in connection with the financial accounting software, Pioneer did not bill HSC for the creation and development of the Local Software.

The initial Local Software programs consisted of the order taking and inventory control programs, including functions to: (1) Maintain open customer order files that were indexed by orders and customer telephone number; (2) maintain a detailed perpetual inventory file, which included a description of the merchandise, quantity available, item number, and warehouse location and activities; (3) maintain customer, or member, master files, which included a customer's name, address, member number, special dates such as anniversary and birth dates, credit card numbers, all pertinent credit information, and a complete history of a customer's purchasing activities; (4) maintain customer service files; and (5) prepare management reports for the sales

and purchasing departments.

HSC began its operations on July 1, 1982, from a broadcast studio located in Clearwater, Florida.  HSC show hosts would show items for sale through the televised programs.  Viewers could call in to order the items shown for sale.  Items were then moved to a mart distribution center maintained by HSC for customer pickup the next day.  In order to purchase merchandise, a viewer had to enroll as a "member" of HSC.  Once the viewer was assigned a member number, the viewer could call and purchase the items being shown on the television program.

As the number of HSC members grew, additional mart locations were added by HSC, which, in turn, increased the complexity of keeping track of the available inventory.  It was important to keep accurate and current records concerning the inventory sold by HSC, because most of the items sold by HSC were unique, one-time acquisitions that could not be reacquired.  HSC's original customer base of approximately 2,000 members grew to 5,000 members by its second month of operation.  By the spring of 1985, HSC had approximately 88,000 members in its database, spanning a two-county area in Florida.

Between 1982 and 1985, Pioneer upgraded its computer system from an IBM System 34 to an IBM System 36 to accommodate HSC's expanding business.  This transition required the modification of the Local Software to enable it to run on an IBM System 36. Pioneer hired an independent computer consultant for this

purpose.  In addition, the Local Software was continually modified, improved, and expanded throughout this period to handle HSC's changing needs.

Initially, all member orders were accumulated at the end of the day and sent to Pioneer to be keyed into the Local Software on Pioneer's IBM System.  The Local Software would determine the location of inventory and determine which items needed to be moved from the warehouse to the marts and among the marts so that a sufficient quantity of inventory was on hand by 6 a.m. the next morning at the mart where the member was to pick up the merchandise.  The Local Software also generated a picking slip, which provided the HSC personnel with the member's order and the specific location of the items so that member orders could be filled quickly.  Eventually, computer terminals were placed in the broadcast studio and in the marts so that inventory could be tracked more quickly and accurately.

In 1985, Mr. Speer and Mr. Paxson were exploring ways to expand HSC's market.  At this time, televised home shopping was new outside the Tampa Bay area.  Mr. Speer and Mr. Paxson organized Home Shopping Network, Inc. (HSN), in order to try to exploit this new, but uncertain, business opportunity.  HSN is a Delaware corporation that was organized to conduct the business of selling merchandise at retail prices through televised

programs on a national format.[4]  Mr. Speer owned 60 percent of the stock of HSN and was the chief executive officer and the chairman of the board of directors of HSN from the time it was founded until he sold his stock in February 1993.  Mr. Paxson owned the remaining 40 percent of the stock and was the president of HSN.

On March 28, 1985, HSN entered into an agreement with Modern Talking Picture Service, Inc., for a 5-hour time segment on satellite (the Satellite Agreement), which would enable it to broadcast nationally.  The term of the agreement commenced on July 1, 1985.  If HSN failed to broadcast for a period of 10 consecutive business days, it would be deemed to have terminated the agreement.

On April 15, 1985, the shareholders and directors of HSC held their annual meeting, during which Mr. Speer and Mr. Paxson presented a proposal to expand HSC to a national format by forming a national group with HSN as a subsidiary.  A majority of the shareholders rejected the proposal, as it required a significant financial commitment and was perceived as too risky. HSC was beginning to realize profits after having lost money during its first fiscal year of operations.  Instead, the HSC shareholders agreed to authorize HSN to use the trademarks,

---

[4]HSN was originally incorporated under the laws of the State of Florida.  Subsequently, in early 1986, HSN organized a wholly owned Delaware subsidiary and merged into it.

management expertise, and development skills of HSC in exchange for 2 percent of its annual gross profits, in perpetuity, with 1 percent to be paid to Pioneer in return for providing the Local Software and technical advice to HSN.  The shareholders also agreed to restrict the activities of HSC to the Tampa Bay area if HSN would agree to exclude itself from the Tampa Bay area.  This agreement was reduced to writing in a License Agreement among HSC, HSN, and Pioneer dated June 21, 1985.  The License Agreement provided in pertinent part:

> WHEREAS, the Licensor [HSC] has developed a localized cable displayed mass merchandising programming technique selling quantities of merchandise at retail prices, and has developed an established logo and trademark * * * and has developed through its computer services supplier, Pioneer Data, Inc., the necessary computer support and has developed warehousing, delivery, sales and logistical support, and has developed a corporate infrastructure experienced in dealing in all aspects of sales management and marketing * * *

>            *     *     *     *     *     *     *

> The Licensors [sic] [HSC] hereby grant to the Licensee [HSN] the exclusive worldwide right and license to enjoy, commercialize and exploit the above described processes * * *  This right is inclusive of the right to exclusively use the trademark and Logo * * * and the existing merchandising format and merchandising processes of Licensor [HSC].  * * *

>            *     *     *     *     *     *     *

> Pioneer Data, Inc., which is the owner of the computer product [sic] which are part of the necessary computer programming to implement or service the above on a national format, shall join in this agreement but its services shall be the subject of a separate computer services agreement.

     *     *     *     *     *     *     *

     The Licensee [HSN] shall pay to the Licensor [HSC] the
     sum of 2% of its gross profits of which 1% of gross
     profits shall be remitted to Pioneer Data, Inc. for its
     development of the existing computer licenses,
     programs, tapes.  * * *

          *     *     *     *     *     *     *

     This agreement shall continue in perpetuity * * *

With its signal being broadcast to a national audience, HSN believed that it would need a larger computer system to handle the potentially large customer base.  Time was of the essence in locating a computer system, because the Satellite Agreement required HSN to begin broadcasting on July 1, 1985.  HSN and Pioneer approached IBM and other computer hardware companies to determine the type of computer system that would best suit HSN's needs.  Burroughs was the company ultimately selected to provide the computer hardware as a result of its ability to upgrade computer hardware without extensive modification of computer software, its willingness to have the order entry system completed by July 1, 1985, its team approach, and its flexible pricing.

On May 13, 1985, Pioneer and Burroughs entered into a contract for the purchase of computer hardware and for Burroughs' programming services to develop software, based upon the Local Software but written in a fourth-generation computer language known as LINC (the National Software), so that the program could

be run on the Burroughs computer hardware. Although Burroughs
had a library of standard computer software available to it, no
such "off-the-shelf" software could be found that would be
sufficient to meet the needs of HSN. The agreement provided that
Pioneer would own any software developed pursuant to the
agreement.

In designing the National Software, representatives from
Burroughs met with Mr. Pfeiffer and representatives from HSN to
discuss the operations and needs of HSN so that they could
determine the data structures, the lengths of the various fields,
and the reports that would need to be generated. Although the
programming code could not be copied from the Local Software as
it was in a different language, the basic descriptions of the
system and reports were taken from the Local Software in
designing the National Software, which saved Burroughs a good
deal of time during the design stage. The National Software
included the functionality of the Local Software in addition to
other functionality to account for differences in the business of
HSN from that conducted by HSC.

Although Burroughs originally believed that it could have
the whole system completed by July 1, 1985, it later concluded
that the only portion of the National Software that it would have
running by July 1, 1985, was the order entry system and the show
control system, which included the ability to print daily sales
reports, picking slips, and shipping labels. The inventory

maintenance system continued to be handled by Pioneer on the IBM System 36 using the Local Software until Burroughs completed that portion of the software sometime around January 1986. Until then, the inventory information was passed between the IBM System 36 computer and the Burroughs computer on a daily basis. Even after the Burroughs computer was handling inventory maintenance, Pioneer continued to generate certain reports related to inventory and rework inventory (i.e., returned merchandise) using the Local Software on the IBM System 36 until early 1993.

During the development of the National Software, Mr. Pfeiffer added several improvements to the Local Software, which continued to be used in HSC's business in the Tampa Bay area. Mr. Pfeiffer also added specific modules in the Local Software to handle the functions required by HSN. These modules provided a backup system in case the Burroughs system was not ready or failed in operation.

On June 17, 1985, HSN hired Stella Tavilla and Carl Brewer to run the Burroughs computer system for HSN. By that time, all the design and specifications of the order entry system had been completed, although Burroughs was still performing the code writing, programming, and testing in anticipation of the July, 1, 1985, deadline.

On July 1, 1985, HSN began operating in a studio located in the Levitz Shopping Center in Clearwater, Florida, separate from HSC's operations. Although HSN and HSC used the same warehouse

to store their merchandise, HSN delivered its merchandise to its customers via United Parcel Service rather than utilizing the mart distribution system used by HSC. HSN's initial operations were not successful. HSN operated at a loss during its first 2 months of operation, and it laid off approximately 100 order takers during its first 2 days on the air. In its third month of operations, HSN began to realize a profit.

On July 16, 1986, HSN granted to Canadian Home Shopping Network, Ltd. (CHSN), an exclusive, perpetual, noncancellable license to use HSN's home shopping format in Canada. The license agreement gave CHSN the right to use, among other things, the Local Software.[5] In exchange for the license, CHSN agreed to pay HSN 5 percent of CHSN's net sales, in perpetuity. CHSN began operations in early 1987. HSN owned approximately 20 percent of the outstanding shares of CHSN,[6] and Mr. Speer and Mr. Paxson sat on the board of directors of CHSN.

Pursuant to its June 21, 1985, License Agreement with

---

[5]The relevant terms of the July 16, 1986, license agreement gave CHSN the right to use HSN's computer software programs, excluding any source material and any software subject to a Burroughs license agreement (presumably the National Software). Although Pioneer owned the Local Software, HSN had been granted an exclusive license to use the software, including the right to sublicense it, in its June 21, 1985, License Agreement with Pioneer and HSC.

[6]HSN was prohibited from acquiring more than 20 percent of CHSN's stock, as Canadian law restricted foreign ownership to 20 percent.

Pioneer and HSC, HSN made the following payments to Pioneer,[7] and Pioneer included these amounts in its income:

| Calendar Year | Amount |
|---|---|
| 1985 | $56,011.30 |
| 1986 | 700,645.57 |
| 1987 | 2,434,457.52 |
| 1988 | 2,453,928.21 |
| 1989 | 2,637,191.00 |
| 1990 | 3,136,668.00 |
| 1991 | 3,639,988.00 |
| 1992 | 3,441,262.00 |

Mr. Speer sold his HSN stock to Liberty Media Corp. (Liberty) in February 1993. After the sale, HSN discontinued making the 1-percent license payments to Pioneer. After engaging in various litigation, HSN agreed to pay Pioneer approximately $4,500,000 to terminate the License Agreement.

Passive Activity Loss Issue

During 1988, 1989, and 1990, Mr. Speer and Mr. Paxson owned 51 percent and 49 percent, respectively, of the stock of Gateway Marine, Inc. (Gateway). Gateway was an S corporation that operated a marine tug and barge business. Mr. Speer set up the corporation, hired its employees, handled finances, discussed the company's bids, and purchased equipment for the company. Petitioners reported losses from Gateway of $24,882, $77,909, and

---

[7]We note that the 1-percent payment by HSN to HSC under the License Agreement terminated in early 1986, when HSC merged into HSN. HSN continued to pay Pioneer the 1-percent license fee.

$78,199 on their joint income tax returns for 1988, 1989, and 1990, respectively.

Also during 1988 through 1990, Mr. Speer and Mr. Paxson owned 51 percent and 49 percent, respectively, of the stock of Maximo Marina, Inc. (Maximo). Maximo was an S corporation that operated a full-service marina. Maximo also operated a used car sales operation (Maximo Motors) during part of 1988 and 1989. Mr. Speer would visit Maxima Motors on his way to HSN to check on its operations and review the prior day's sales. Mr. Speer reported losses from Maximo of $477,836, $1,098,156, and $632,643 on petitioners' joint income tax returns for 1988, 1989, and 1990, respectively.

Mr. Speer did not keep a diary of the amount of time he devoted to Gateway and Maximo during 1988, 1989, and 1990. During those years, Mr. Speer performed work for approximately 30 family-owned companies; however, he devoted a majority of his time, approximately 75 percent, to his duties at HSN. Mr. Speer typically worked for these companies in an executive capacity, making management decisions. Generally, Mr. Speer would try to visit his various companies two or three times a week.

OPINION

Constructive Dividend Issue

The first issue is whether petitioners received constructive

dividend income during the taxable years 1988 through 1990, as a result of payments made by HSN to Pioneer pursuant to the License Agreement. Respondent argues that the License Agreement was a sham designed to distribute profits of HSN to Mr. Speer. Respondent contends that Mr. Speer essentially controlled Pioneer and that the payment of 1 percent of HSN's gross profits for the ostensible purpose of licensing software from Pioneer constituted a constructive dividend to Mr. Speer. Moreover, respondent contends that the transfer of the constructive dividend amounts to Pioneer resulted in a gift to Richard M. Speer, petitioners' son, who was the sole shareholder of Pioneer. Petitioners, on the other hand, argue that the License Agreement was an arm's-length agreement, agreed to by parties independent of, and whose interests were adverse to, Mr. Speer. Alternatively, petitioners argue that even if the License Agreement were found not to be arm's length, the terms of the agreement were fair and reasonable when judged by standards applicable to parties dealing at arm's length, and thus cannot be recharacterized as a constructive dividend to Mr. Speer.

It is well established that transfers between related corporations may result in constructive dividends to a common shareholder. Joseph Lupowitz Sons, Inc. v. Commissioner, 497 F.2d 862, 868 (3d Cir. 1974), affg. in part, revg. in part and remanding T.C. Memo. 1972-238; Gilbert v. Commissioner, 74 T.C. 60, 64 (1980). However, transfers between related corporations

will not result in constructive dividends to a common shareholder solely by reason of the common ownership. Sammons v. Commissioner, 472 F.2d 449, 451 (5th Cir. 1972), affg. in part and revg. in part on rehearing T.C. Memo. 1971-145. The transfer must be for the personal benefit of the common shareholder, and the resulting benefit must be more than incidental. Rapid Elec. Co. v. Commissioner, 61 T.C. 232, 239 (1973); Ross Glove Co. v. Commissioner, 60 T.C. 569, 595 (1973); Rushing v. Commissioner, 52 T.C. 888, 893 (1969), affd. 441 F.2d 593 (5th Cir. 1971).

The constructive dividend theory is used to prevent the siphoning of corporate profits under the guise of a sale or other transfer of assets by placing any transfer between related corporations on a tax parity with arm's-length dealings between unrelated parties. Champayne v. Commissioner, 26 T.C. 634, 645 (1956). Thus, both the bona fide nature of the transaction and the reasonableness of the payments require consideration. Id. Where the evidence is sufficient to establish that the transaction was bona fide and conducted in an arm's-length manner, then the ultimate objective of the constructive dividend theory has been attained, and it is unnecessary for us to independently determine the value of the property transferred. Sparks Nugget, Inc. v. Commissioner, 458 F.2d 631, 635 (9th Cir. 1972), affg. T.C. Memo. 1970-74; Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. 199 F.2d 373 (6th Cir. 1952). Whether a transaction is bona fide and arm's length is a question of fact,

and the burden of proof is on the taxpayers.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

We agree with petitioners that the License Agreement was a bona fide, arm's-length agreement.  This is not a case where a sole shareholder is dealing with a corporation.  To the contrary, the shareholders of HSC knew of the proposal to move to a national format and were given an opportunity to share in the expansion.  However, they were unwilling to risk the success that HSC had attained in order to share the opportunity to expand nationally; instead, they approved the terms of the License Agreement, including the 1-percent license fee payable to Pioneer for the Local Software.  See Roman Systems, Ltd. v. Commissioner, T.C. Memo. 1981-273.  The interests of the HSC shareholders with regard to the transaction were adverse to those of Mr. Speer.  In particular, the largest minority shareholder of HSC, Mr. Paxson, as trustee of the Barbara A. Paxson Trust, had every interest in minimizing the payments to Pioneer, a company in which he held no stake.  Mr. Paxson testified, however, that at the time the License Agreement was entered into, he felt that the license fee payable to Pioneer for the Local Software was equitable and reasonable.  Moreover, Mr. Baker, as trustee of the Roy M. Speer Trust, the controlling shareholder of HSC,[8] recognized that he

_____

[8]Respondent argues that Mr. Speer was actually the controlling shareholder of HSC, because he owned 51 percent of the stock through the Roy M. Speer Trust.  Respondent contends
(continued...)

would have to place the trust assets at risk in order to finance a national expansion, which he was unwilling to do. Mr. Baker testified that he agreed to the terms of the License Agreement.

Respondent argues that the Local Software was of no use to HSN, since it could not be used on the Burroughs computer hardware. Thus, respondent concludes, the agreement to pay for the license of such software was a sham. We disagree.

HSN substantially benefited from securing the rights to the Local Software. Even though Burroughs could not copy the programming code from the Local Software to develop the National Software, the basic descriptions of HSN's system and reports were taken from the Local Software in designing the National Software. The sales representatives and one of the system developers at Burroughs testified that using the Local Software in this manner saved Burroughs a great deal of time during the design stages of the software development, which was important if HSN wanted to have the National Software running by its July 1, 1985, deadline. The Local Software also provided a valuable backup system in the event the National Software failed. As it turned out, HSN relied on the Local Software to manage its inventory from July 1, 1985,

---

[8](...continued)
that Mr. Baker, the trustee and a longtime business acquaintance of Mr. Speer, did whatever Mr. Speer wanted of him. Mr. Baker testified that as the trustee of the Roy M. Speer Trust, he owed a fiduciary duty to the trust and its beneficiary, Lynnda Speer. We find Mr. Baker's testimony to be credible and are, thus, unwilling to attribute the ownership of the HSC stock to Mr. Speer.

until January 1, 1986, when Burroughs completed the inventory maintenance system for the National Software. HSN's ability to function during this initial startup phase was critical to its survival and ultimately to its phenomenal success.

Respondent also argues that defects in the License Agreement itself illustrate its sham nature. For example, respondent points out that the agreement does not specifically identify the "computer licenses, programs, tapes" that HSN was licensing from Pioneer and that the agreement does not define "gross profits". Respondent also points out that Mr. Speer signed the agreement as the president of Pioneer, even though he did not hold that title. We find this argument unpersuasive. Although the License Agreement may have been inartfully drafted, the evidence indicates that the parties understood the term "computer licenses, programs, tapes" to refer to the Local Software as opposed to the financial accounting software and the term "gross profits" to be used in its general accounting sense (i.e., sales less returns, breakage, and cost of goods sold). Moreover, HSN made payments to Pioneer, and Pioneer accepted these payments and included them in income on its Federal income tax returns. We think that any indefiniteness in the terms of the agreement was cured by the parties' subsequent performance. See 1 Williston on Contracts, sec. 4:29 (4th ed. 1990).

Finally, the fact that Mr. Speer was not president of Pioneer when he signed the License Agreement does not negate the

License Agreement.  Mr. Speer provided services to Pioneer during the years in issue and was compensated for his services by Pioneer.  Based on the totality of the facts presented, we find that Mr. Speer was acting on behalf of Pioneer when he signed the License Agreement.

The License Agreement served a valid business purpose and was approved by independent, unrelated shareholders.  Despite respondent's assertion that Mr. Speer made the business decisions and essentially controlled HSN, HSC, and Pioneer, respondent has not argued that we should disregard the corporations as separate, viable taxable entities, nor do we find any basis for doing so. There is no evidence that Mr. Speer or his son, Richard, personally received the license fees paid by HSN to Pioneer. Pioneer actually received the license payments and included them in its income for Federal income tax purposes.[9]  Any benefit that

_____

[9]Pioneer is now barred by the statute of limitations from claiming a refund for the taxable years 1985 through 1987. Petitioners have asserted the affirmative defense of equitable recoupment in the event this Court upholds respondent's determination that the license payments should be recharacterized as constructive dividends from HSN to Mr. Speer followed by a gift to his son, Richard M. Speer.  The doctrine of equitable recoupment prevents unjust enrichment and may be invoked by a taxpayer to recover taxes erroneously collected from the same taxpayer or one with a sufficient identity of interest, where the refund of such erroneously collected taxes is otherwise barred by the statute of limitations. Stone v. White, 301 U.S. 532 (1937); Estate of Mueller v. Commissioner, 101 T.C. 551 (1993). Petitioners contend that respondent is seeking to subject the license payments to multiple taxes based on inconsistent legal theories (i.e., gross income to Pioneer and a constructive dividend followed by a gift).  Moreover, respondent has asserted
(continued...)

was received was, at most, derivative or indirect in nature. Therefore, we find that the License Agreement was a bona fide, arm's-length agreement, which did not result in constructive dividends to Mr. Speer.

Even if the agreement itself were not arm's length, it is still enforceable, and thus will not give rise to constructive dividends, if its terms, particularly the amount of the payments, are fair and reasonable when judged by the standards of a transaction entered into by parties dealing at arm's length. Sparks Nugget, Inc. v. Commissioner, 458 F.2d at 635; Stearns Magnetic Manufacturing Co. v. Commissioner, 208 F.2d 849, 852 (7th Cir. 1954); Place v. Commissioner, 17 T.C. at 203. We must assess the reasonableness of the License Agreement at the time it was entered without the benefit of hindsight. If the terms were reasonable as of that date, it is immaterial that HSN's success may have gone beyond the parties' expectations and produced license fees in excess of what would be considered reasonable for a single year viewed in isolation. See Brown Printing Co. v. Commissioner, 255 F.2d 436, 440 (5th Cir. 1958), revg. T.C. Memo. 1957-37.

At the time the parties agreed to license the Local Software

---

[9](...continued)
that Mr. Speer really controlled Pioneer. Because of our holding with respect to the constructive dividend issue, however, we need not address the question of whether equitable recoupment would apply.

for 1 percent of gross profits, HSN had not begun operations. The amount of the license fees was contingent upon the success of HSN and, thus, was quite uncertain. Televised home shopping was a new business outside the Tampa Bay area. The shareholders of HSC viewed HSN as a risky venture. Even Mr. Speer and Mr. Paxson, while hopeful, were unsure whether the concept of home shopping, which had just started to become successful in a local market, would catch on nationwide. In fact, HSN performed poorly during its first couple of months of operation. The ultimate success of HSN was beyond the wildest expectations of Mr. Speer and Mr. Paxson.

Both parties presented expert testimony as to the value of the Local Software as of June 21, 1985, the date of the License Agreement. While expert opinions can assist the Court in evaluating a claim, we are not bound by the opinion of any expert witness and may reach a decision based on our own analysis of all the evidence in the record. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Robert F. Reilly, petitioners' expert,[10] utilized several approaches to valuing the Local Software. First, he attempted to perform a market analysis but concluded that there were no available "off-the-shelf" computer software packages that were

---

[10]Petitioners also presented the report of Lawrence H. Putnam, Sr., as an expert rebuttal report.

comparable to the Local Software in terms of functionality and utility as of the valuation date.  Next, Mr. Reilly performed two cost approach methods--the constructive cost model (COCOMO) and the software lifecycle management (SLIM) model.[11]  Both models are empirical cost approach models; that is, the development time and cost of the subject software are estimated by reference to a large database of actual software development projects.  These models are used by companies to project the costs of various projects.  The COCOMO approach estimates the amount of effort required to reproduce the software, and the SLIM approach utilizes a computerized model, which permits the user to estimate the cost of developing the subject software from a database of over 3,000 actual software projects.  Next, Mr. Reilly performed two income approach methods.  He used the SLIM model to estimate the cost savings, or income increment, associated with having the Local Software available during the development of the National Software.  He also applied a lost income method, under which he estimated the amount of income that would have been lost to HSN if HSN had not been operational as of the July 1, 1985, startup date.  Mr. Reilly reached an overall valuation conclusion, giving similar weight to each approach, of $2,900,000.

Mr. Reilly then compared this value to the value of the License Agreement.  Mr. Reilly used the discounted cash-flow

---

[11]The SLIM model was developed by Mr. Putnam, petitioners' rebuttal expert witness.

method to determine the present value of the future cash flows generated by the License Agreement. Mr. Reilly applied a discount rate of 49.6 percent to account for the high degree of risk associated with the startup venture and the risk in general for small, thinly capitalized equity investments. Mr. Reilly applied this discount to two income streams--the actual payments made by HSN to Pioneer from July 1985 through 1993 and the projected payments based on estimates of HSN's penetration level with nationwide cable operators, average purchases by viewers, and HSN's gross profit margin. Assigning similar weight to each approach, Mr. Reilly concluded that the value of the License Agreement as of June 21, 1985, was $2,600,000, within the range of value for the Local Software.

Douglas F. Benn and Udo W. Pooch, respondent's experts, utilized the VALPRO model, developed by Mr. Benn, to estimate reproduction and replacement costs for the Local Software. The VALPRO model attempts to incorporate and synthesize a number of widely accepted methods. It is based on the concept of the software development process as a long life cycle, a concept developed by Lawrence H. Putnam, Sr. The VALPRO model, however, has had no commercial usage or publication. Pursuant to this method, respondent's experts concluded that the cost to replace the Local Software was $58,394, and the cost to reproduce the software (after applying an adjustment for obsolescence) was $148,960. Next, Messrs. Benn and Pooch determined from a

comparable sales approach that functionally equivalent systems could be purchased and installed for $21,925. Finally, Messrs. Benn and Pooch applied an income approach, capitalizing the stream of income to HSN that might be derived from the use of the Local Software. Under this approach, however, Messrs. Benn and Pooch concluded that the capitalized income stream had no effect on the final fair market value determination, because the income stream was indeterminate. Overall, respondent's experts concluded that the Local Software had a value of $58,394.[12]

Mr. Putnam, upon whose work the VALPRO model relies, stated in his rebuttal report that his work was taken out of context and inappropriately applied. Mr. Putnam also noted that he compared the valuation of Messrs. Benn and Pooch with actual cost data on

---

[12]Respondent argues on brief that the value should be only $42,192 after eliminating duplicate lines of code and programs that were added to the Local Software after June 21, 1985, and set out the revised calculations in appendices attached to her brief. Appendix 1 was prepared by Mr. Benn and appears to be an amendment to his valuation report. (This would actually constitute a second amendment, since an amendment to his report was admitted during the trial.) Appendices 2-4 were prepared by agents of respondent and set forth a summary of the parsed software, duplicate lines of code, and programs added after June 21, 1985. On Apr. 21, 1995, petitioners filed a Motion to Strike Portions of Brief for Respondent, asking this Court to strike these appendices as an improper attempt to introduce evidence after the record was closed. We agree. Allowing respondent's experts to amend their report after the record is closed would unfairly prejudice petitioners, as petitioners did not have the opportunity to rebut or cross-examine respondent's experts with respect to these additional matters. Moreover, the agents who prepared appendices 2-4 were not identified as witnesses in respondent's trial memorandum and did not testify in this case. We, therefore, grant petitioners' Motion to Strike Portions of Brief for Respondent.

comparable projects completed during the same time period and found the VALPRO model to be highly biased in favor of producing very low cost estimates. Moreover, we note that respondent's experts found the income stream from the Local Software to be indeterminate and, thus, were unable to conclude what the 1-percent license fee was worth as of June 21, 1985.

We need not determine the precise value of the software. We need only compare the value of the Local Software with the reasonably anticipated value of the future license payments in order to determine whether the terms of the agreement are reasonable when judged by the standards of an arm's-length transaction. Sparks Nugget, Inc. v. Commissioner, 458 F.2d at 635; Stearns Magnetic Manufacturing Co. v. Commissioner, 208 F.2d at 852; Place v. Commissioner, 17 T.C. at 203.

We think it is significant that both parties' experts determined that the software was of some value to HSN, even though these values are widely divergent. The parties to the License Agreement did not obtain or rely upon an expert valuation of the Local Software when they entered into the agreement. Nor could they have accurately predicted the value of the 1-percent license fee. What the parties to the agreement did know at the time of the agreement was that (1) HSN needed a software program that would perform the functions that the Local Software performed, (2) HSN needed such software quickly, (3) HSC and Pioneer, after spending a considerable amount of time developing

and refining the Local Software, had a tested, working, and successful program in their possession, (4) the Local Software could be used to develop and supplement the National Software, and (5) the success of HSN's new business endeavor was highly speculative. Under the circumstances, we think that HSN's agreement to pay 1 percent of its gross income for the software was reasonable. It is immaterial that HSN's success may have gone beyond the parties' wildest expectations. See Brown Printing Co. v. Commissioner, 255 F.2d at 440. Indeed, had the other shareholders of HSC anticipated that the gross profits of HSN would be so great, they would have invested in it when given the opportunity to do so.

Finally, in rejecting respondent's primary argument that the License Agreement was a sham, we note that the License Agreement had been disclosed in HSN's public filings, including its annual reports, prospectuses, and proxy statements. After Mr. Speer sold his interest in HSN, HSN paid Pioneer more than $4 million to terminate its obligation to pay the 1-percent license fee.

After considering all the evidence, we hold that Mr. Speer did not receive constructive dividend income during the taxable years 1988 through 1990, as a result of payments made by HSN to Pioneer pursuant to the License Agreement. It follows that petitioners did not make gifts during the taxable years 1985 through 1990 in amounts equal to these license payments to their son, Richard M. Speer.

Passive Activity Loss Issue

The next issue is whether petitioners' claimed losses for the taxable years 1988 through 1990 from two subchapter S corporations, Gateway and Maximo, constitute passive activity losses as defined in section 469.  Pursuant to section 469(a), a passive activity loss of an individual for the taxable year is generally not allowed as a deduction.  A passive activity is defined as a trade or business in which the taxpayer does not materially participate.  Sec. 469(c)(1).  Section 469(h)(1) provides that an individual shall be treated as materially participating in an activity only if he or she is involved in the operations of the activity on a basis that is regular, continuous, and substantial.  The regulations contain seven safe harbor provisions under which an individual will be treated as materially participating in an activity.  Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).

Petitioners rely on section 1.469-5T(a)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), which provides:

> The activity is a significant participation activity
> * * * for the taxable year, and the individual's
> aggregate participation in all significant
> participation activities during such year exceeds 500
> hours;

A significant participation activity is defined as a trade or

business activity in which the individual significantly participates but in which the individual would not be treated as materially participating under any of the other safe harbor provisions.  Sec. 1.469-5T(c)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).  An individual is treated as significantly participating in an activity for a taxable year only if he or she participates in the activity for more than 100 hours.  Sec. 1.469-5T(c)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

A taxpayer can establish his or her participation by any reasonable means.  Reasonable means "may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries."  Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).  Contemporaneous daily time reports are not required if the extent of the taxpayer's participation may be established by other reasonable means.  Id.

Petitioners attempt to come within the provisions of section 1.469-5T(f)(4), Temporary Income Tax Regs., supra, by relying on Mr. Speer's testimony that, during 1988, 1989, and 1990, he devoted over 150 hours to Gateway, over 250 hours to Maximo, and over 150 hours to another business named Scheer Commerce Center, Inc. (Scheer).

Mr. Speer did not keep a diary of the amount of time he devoted to Gateway, Maximo, and Scheer during 1988, 1989, and 1990, nor did petitioners offer any records similar to those described in the above regulation. Petitioners claim, however, that Mr. Speer's testimony about the various types of activities he engaged in with respect to Gateway and Maximo and the approximate number of hours he spent on these activities constitutes a "narrative summary" sufficient to establish material participation. Although the regulations are somewhat inconclusive concerning the records needed to substantiate material participation, we do not think that they contemplate this type of postevent "ballpark guesstimate" that petitioners used. Goshorn v. Commissioner, T.C. Memo. 1993-578. We, therefore, find that petitioners have not met their burden of proving that Mr. Speer materially participated in the activities in question. Rule 142(a).

Additions to Tax

Respondent determined that petitioners were liable for an addition to tax for negligence or intentional disregard of rules or regulations pursuant to section 6653(a)(1) for 1988 and a penalty for negligence pursuant to section 6662(a) for 1989 and 1990 with respect to petitioners' failure to report constructive dividend income during those taxable years. Respondent also determined that petitioners were liable for the addition to tax

for a substantial understatement of tax liability under section 6661(a) and for increased interest on tax-motivated transactions under section 6621(b) for 1988. These additions to tax, too, were applied with respect to petitioners' failure to report constructive dividend income during that year. Finally, respondent determined that Mr. Speer was liable for additions to tax for failure to file gift tax returns under section 6651(a)(1) for the tax years 1985 through 1989.

Because we have held that petitioners did not receive constructive dividend income during the years in issue and, likewise, did not make gifts of the license fees to their son, Richard M. Speer, we hold that petitioners are not liable for any of the above additions to tax.

<u>Decisions will be entered for petitioners in docket Nos. 6626-94 and 6628-94</u>.

<u>Decision will be entered under Rule 155 in docket No. 6627-94</u>.

<u>An appropriate order will be issued granting petitioners' Motion to Strike Portions of Brief for Respondent</u>.