T.C. Memo. 2000-58


UNITED STATES TAX COURT


CASCADE DESIGNS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JAMES M. AND JANE I. LEA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11498-98, 12555-98.     Filed February 23, 2000.


<u>Carmen J. SantaMaria</u>, for petitioner in docket
No. 11498-98.

<u>Darrell D. Hallett</u> and <u>Scott A. Schumacher</u>, for petitioners
in docket No. 12555-98.

<u>William A. McCarthy</u> and <u>Sandra Veliz</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, <u>Judge</u>:  Respondent determined deficiencies and

accuracy-related penalties in Cascade Designs, Inc.'s (Cascade or the corporation) Federal income tax in the following amounts:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1992 | $592,921 | $118,584 |
| 1993 | 162,240 | 32,448 |
| 1994 | 182,378 | 36,476 |
| 1995 | 196,621 | 39,324 |
| 1996 | 90,564 | 18,113 |

Respondent determined deficiencies and accuracy-related penalties in James M. and Jane I. Lea's (the Leas) Federal income tax in the following amounts:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1993 | $62,355 | $12,471 |
| 1994 | 65,462 | 13,092 |
| 1995 | 56,326 | 11,265 |
| 1996 | 28,640 | 5,728 |

These cases were consolidated for trial, briefing, and opinion by order of this Court dated November 18, 1998.

The issues for decision are: (1) Whether the payments Cascade made to James M. Lea (Lea) during the years at issue were expenditures for the purchase of certain patents and, therefore, deductible as patent amortization expenses. We find they are. (2) Whether the Leas may report the payments as capital gain income under section 1235.[1] Respondent's position on this issue

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

in Rev. Rul. 69-482, 1969-2 C.B. 164, is that these payments are capital gains; we therefore treat respondent's position in Rev. Rul. 69-482, supra, as a concession that the Leas are entitled to report the payments as capital gains. (3) Whether Cascade or Lea is liable for an accuracy-related penalty. Because of our disposition of the preceding issues, we need not address this issue.

## FINDINGS OF FACT

Some of the facts in this case have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated into our findings by this reference. Cascade is a C corporation, whose principal place of business was in Seattle, Washington, at the time it filed its petition in this case. At the time they filed their petition in this case, the Leas resided in Seattle, Washington.

Lea is a mechanical engineer and was continuously employed by the Boeing Co. (Boeing) from 1948 to 1971. In mid-1971, Lea was laid off from Boeing until late 1972. While he was laid off, Lea began to investigate products that he could invent, manufacture, and sell. Lea's friend and fellow engineer, John Burroughs (Burroughs), suggested that there was a need for a better sleeping pad for hikers and mountain climbers than was being produced. Lea, with the help of another friend, Neil Anderson (Anderson), designed a high-quality foam-filled self-

inflating air mattress (mattress) for use by backpacking and mountain climbing enthusiasts.

## The Patents

In January 1972, Lea and Anderson applied for a patent on the design of the mattress, and U.S. Patent No. 3,872,525 (the 525 Patent) was issued on March 25, 1975. Later, on February 3, 1976, Lea and Burroughs were issued U.S. patent No. 3,935,690 (the 690 patent) for their method of packaging the mattresses. On May 31, 1977, Lea and Anderson were issued U.S. patent No. 4,025,974 (the 974 patent) for their method of making the mattresses.

## The Incorporation

On April 24, 1972, Cascade was incorporated in the State of Washington for the purpose of manufacturing and selling the mattresses under the name "Therm-A-Rest". Cascade was capitalized with $1,000, and its stock was owned as follows:

| Shareholder | Ownership Percentage |
|---|---|
| Lea | 60 |
| Burroughs | 20 |
| John Lea[1] | 20 |
| Total | 100 |

[1] John Lea is Lea's brother.

Lea returned to work for Boeing in November 1972, where he continued to work until June 1978. During these years, Lea and Burroughs were full-time employees of Boeing, and worked for

Cascade on a part-time basis, which included working evenings, on weekends, and during vacations.

The Officers and Their Duties

Lea was the president of Cascade, Burroughs was the vice president and treasurer, and John Lea was the secretary and corporate counsel.

Lea supervised production and quality control of the mattresses. Burroughs supervised Cascade's sales and marketing. Burroughs' duties included developing cash-flow models that were used to determine whether to purchase new equipment and when to pay the corporate officers. John Lea's duties were to take notes at the officer's meetings and attend to the corporation's legal matters.

The Recapitalization

In 1978, Lea retired from Boeing and became the first full-time employee at Cascade. In this year, Cascade was recapitalized to reflect better the relative contributions of the various shareholders. As a result of the recapitalization, Cascade's stock was owned as follows:

| Shareholder | Ownership Percentage |
|---|---|
| Lea | 62 |
| Burroughs | 29 |
| John Lea | 8 |
| Richard Brooks (Brooks) | 1 |
| Total | 100 |

These shareholders were the only members of Cascade's board of directors, and each retained his ownership percentage until 1991.

The 1979 Sales Agreement and Patent Assignment

On January 9, 1979, Lea entered into an agreement (the 1979 sales agreement) with Cascade to sell "his entire right, title and interest in and to" the 525, the 690, and the 974 patents, U.S. Patent Application S.N. 800,288 (the patent application for the "Method of Making Self-Inflating Air Mattress"), and the British and Japanese patent applications for the mattress.[2] The 1979 sales agreement, in relevant part, provided the following:

> a.   The total sales price for such sale is three hundred thousand dollars ($300,000).  Since it is recognized that Cascade Designs, Inc. does not at this time have the resources to make a cash payment of $300,000, it is agreed that payment can be made only out of the money received by Cascade Designs for sales of the air mattresses which it markets.
>
> Payment shall be made as follows:
>
> 1.  For each air mattress sold by Cascade Designs, Inc., covered by any one of the patents or patent applications noted above, James M. Lea shall receive an amount of money equal to 5% of the gross selling price.
>
> *     *     *     *     *     *     *
>
> b.   Payments shall continue to be paid as

---

[2]Anderson sold his interests in the 525 and the 974 patents, and the U.S., British, and Japanese patent applications, on Jan. 7, 1979, for 0.134 percent of the gross sales price of each air mattress.  Payments made to Anderson for these properties are not at issue in this case.

specified in paragraphs (1) * * * until the total amount of $300,000 is paid.  In computing payment from year to year, the amount remaining due at the end of each year will be adjusted according to the inflation rate so that it will reflect the dollar value in the year 1977.  * * *

> \*       \*       \*       \*       \*       \*       \*

3.   This agreement shall remain in force until all of said U.S. and foreign patents expire or until the payments have been made in full, whichever occurs first.

4. * * * Quarterly, within thirty days after the first days of January, April, July, and October of each year during the continuance of this agreement, Cascade Designs, Inc. shall render writting [sic] reports to James M. Lea, stating in each report the quantities and net selling prices of all air mattresses sold by Cascade Designs, Inc. during the preceding three calendar months.  Each such report shall be accompanied by remittance in full covering the payments shown thereby to be due James M. Lea.

> \*       \*       \*       \*       \*       \*       \*

6.   If Cascade Designs, Inc. fails to pay James M. Lea the moneys payable under the terms of this agreement, or fails to keep or perform any other obligation of the agreement, then James M. Lea may, at his option terminate this agreement by giving sixty days written notice, specifying the default complained of; provided, however, that if Cascade Designs, Inc. shall, within such sixty days, cure the default complained of, then the notice shall cease to be operative and this agreement shall continue on [sic] full force and effect as though such default had not occurred; and provided further, that if Cascade Designs shall within such sixty days notify James M. Lea in writing that it disputes the asserted default, the matter shall be submitted to arbitration as hereinafter provided.

The patent and patent applications covered by the 1979 sales

agreement, except the 690 patent, were officially assigned by Lea

to Cascade by an assignment document, which was recorded with the U.S. Patent and Trademark Office on March 19, 1979.  The assignment conveyed to Cascade "all letters patent, domestic and foreign, which have issued or may issue thereon, whether said Letters Patent issued directly or by * * * division".

Selling Mattresses Is a Seasonal Business

The recreational mattress industry is a seasonal business; most of Cascade's sales were made in late spring and early summer, and most of its sales revenue was received between July and November.  Consequently, its cash-flow was also seasonal, peaking in late fall and early winter.  However, to meet the demands of the market during the peak sales season and to retain its experienced work force, Cascade had to manufacture mattresses year-round.

Each year, the demand for Cascade's mattresses increased dramatically.  To keep pace with the market's increased demand, each year Cascade manufactured more mattresses and increased its inventory of goods available for sale.  This practice resulted in the exhaustion of its financial resources by late spring of every year.

The Manufacturing Facilities

For a short while, the first mattresses were manufactured in a grimy machine shop where the press to manufacture the mattresses had been made.  Cascade required larger facilities to

realize its growth potential, and it soon moved its manufacturing operation to a training facility for handicapped workers. However, this facility proved unsatisfactory because once the handicapped workers were trained to manufacture the mattresses, they were replaced by new workers who required training. As a result, Cascade was manufacturing mattresses with an unskilled workforce that it was constantly training.

After approximately 1 year at the training facility, Cascade moved its manufacturing equipment to a building near the Kingdome and contracted to have the mattresses manufactured. This arrangement was unsatisfactory because much of the potential profit on the manufacturing operation was paid to the manufacturing contractor. Finally, in 1981, Cascade moved to its present location by renting a small corner of the building that it later purchased.

At the time of its final move, Cascade recognized that its manufacturing equipment was inadequate to produce all the mattresses that it could market. Therefore, while the mattresses were being manufactured under contract, Cascade designed and built larger and heavier equipment for its new location.

Cash-Flow Problems

Cascade was undercapitalized and had cash-flow problems. Because the shareholders were uncertain of the success of the corporation, they generally were unwilling to make personal loans

to Cascade and also refused to guarantee a bank loan to the corporation.

Cascade obtained its first line of credit in 1981.  The credit limit was $100,000, which was further limited to the value of, and secured by, Cascade's accounts receivable and its inventory of finished goods.  Amounts advanced under the line of credit bore an annual interest rate of 22.5 percent.  The corporation was generally averse to incurring debt because the high rate of interest made it difficult for Cascade to make a profit on borrowed money.  Instead of borrowing, the corporation retained its earnings to self-finance its working capital requirements.

The board of directors and the corporate officers considered that the best use of the corporation's working capital was to pay its labor force and the various materials suppliers and to increase its manufacturing capability with larger facilities and improved production equipment.  Consequently, the officers' salaries were often in arrears, and Cascade did not make all the quarterly payments due Lea under the 1979 sales agreement.  By December 31, 1982, Cascade owed Lea $259,128 in delinquent payments.

Lea's Demand for Payment and the 1982 Agreement

Lea did not make a written demand for payment; however, the minutes of the officers' meetings on March 31 and September 23,

1982, report that Lea demanded payment of the delinquent amounts, and that the corporate officers considered whether Cascade could make the payments. Because the corporation required all its working capital to build its inventory of goods available for sale, Lea suggested that Cascade get a loan from a bank or that the other officers make loans to the corporation so that Cascade could pay the amounts owed to him. The other officers rejected this proposal.

The minutes of the officers' meeting on December 1, 1982, reported that $130,000 of the amount owed to Lea would be paid during the month, but the balance due in April would not be paid until July or August of 1983. These minutes also report that Lea had consulted a lawyer about the patent payments and intended to meet with him again. The minutes of the February 23, 1983, meeting report that $250,000 was still due Lea and could not be paid. At this meeting, the officers discussed setting up an installment schedule to pay the outstanding balance over time.

After Lea's consultations with his lawyer, Lea and Cascade agreed to renegotiate the 1979 sales agreement. The renegotiated agreement (the 1982 agreement[3] or the agreement), recognized that Cascade was in breach of the 1979 sales agreement, and, in

---

[3]Although we refer to the agreement as "the 1982 agreement", the parties spent some time negotiating its terms, and the agreement was not entered into until April or May 1983.

pertinent part, provided the following:

5.  NEW PATENTS AND PATENTS PENDING

Since the original sales agreement was entered into, Lea has been granted an additional patent as follows

US Patent 4,261,776 [the 776 patent[4]]"Method of making self-inflated air mattresses" issued April 14, 1981.

Lea has also applied for an additional patent under:

SN 395,750 [the 750 patent application or the 750 technology[5]] "Method and apparatus for making air mattresses" filed July 6, 1982.

The additional patent and patent pending are improvements on the prior patent sold to Cascade by Lea and are valuable to Cascade in the manufacturing of air mattresses, pads and related products and methods.

*     *     *     *     *     *     *

7.  NEW CONSIDERATION

In consideration for Lea waiving prior breaches of the original sales agreement by Cascade, of waiving any claim which Lea may have for interest on unpaid amounts due,[6] and of Lea granting to Cascade his entire right, title, and interest in and to the new patent and patent

---

[4]The 776 patent was a division of U.S. Patent Application S.N. 800,288, "Method of Making Self-Inflating Air Mattress".

[5]No patent was ever granted on the 750 patent application; the application was rejected by the U.S. Patent and Trademark Office primarily because of its "obviousness". Cascade used the 750 technology in its manufacturing process and regarded it as a trade secret.

[6]At the time Cascade and Lea entered into the 1982 agreement, the interest on the delinquent payments totaled approximately $39,102.

application described in paragraph 5 above, Cascade enters into this agreement and makes the promises contained hereinafter:

### 8. AFFIRMATION OF ORIGINAL SALE

Lea hereby affirms that he has and does hereby sell all of his right, title and interest in and to the patent and patent applications described in the original sales agreement and to the new patent and patent application described in paragraph 5 hereof.

### 9. SALES PRICE

Cascade hereby agrees to pay Lea as consideration for the waiver, reconveyance and conveyance by Lea contained herein $10,000,000.00 less $172,310.00 representing payments made under the original sales agreement and less $259,128.03 representing amounts earned but not paid by Cascade to Lea under the original sales agreement or as otherwise mathematically stated the remaining sum of $9,568,561.97.

     *    *    *    *    *    *    *

### 11. PAYMENT

Payment shall be made on or before the thirtieth (30th) day of January, April, July, and October of each year as follows:

    A. For each product sold by Cascade covered by any one of the patents or patent applications noted above Cascade shall pay Lea an amount of money equal to five percent (5%) of the gross selling price.

        *    *    *    *    *    *    *

    C. This agreement shall remain in force until all of said U.S. and foreign patents expire or until the payments have been made in full, whichever occurs first.

### 12. ROYALTY REVIEW

        *    *    *    *    *    *    *

It further [sic] recognized that, for Cascade to market its products competitively, there needs to be a reasonable limit as to percentage of the selling price which can be allocated to royalty payments or the like. Accordingly, Cascade shall have the right to review on an annual basis the patents and patent applications sold by Lea to Cascade along with such other improvements which might be incorporated in its product line, to determine if there should be any reallocation of the five percent (5%) payments which are to be made to Lea for the following calendar year. If Cascade determines that such other improvements have substantial merit and make a significant contribution to the technology incorporated in Cascade's products or in the process for making the products, then Cascade may, in its discretion, make a reallocation of the five percent (5%) payments to be made Lea, * * * .

On April 20, 1983, in accordance with the 1982 agreement, Cascade delivered to Lea an installment note for $259,128.03, the amount of the payments delinquent under the 1979 sales agreement. The note required quarterly interest payments and two equal principal payments on December 31, 1983 and 1984.

Improved Cash-flow and Prosperity

Cascade made several changes that improved its cash-flow. First, instead of contracting out the manufacturing operation, Cascade began to manufacture the mattresses itself. This change allowed Cascade to retain the contractor's profit, which it estimated was approximately $100,000. Cascade also improved the manufacturing operation by changing from a cut-out method to a peel-out method of removing the mattresses from the presses. Once the workers became proficient at using the new method, each mattress was manufactured more quickly and, therefore, at a lower

cost.

Second, in November 1982, Cascade hired a new controller, Lee Fromson (Fromson), who implemented certain changes in Cascade's financial operations that improved its cash-flow during 1983. For instance, Fromson introduced the corporation to computers, which Cascade used to automate its system of accounting for sales and receipts. To quickly improve the corporation's cash-flow, Fromson hired a full-time credit manager who expeditiously collected the accounts receivable and a purchasing manager who negotiated more favorable prices and payment terms with the corporation's vendors.

Most importantly, to fund Cascade's growth, Fromson negotiated with the bank for an increased line of credit at a lower rate of interest, and he convinced the corporate officers to use it. The credit limit was increased to $125,000 in April and to $150,000 in June 1983, and the initial interest rate was fixed at 11.5 percent. For the years 1983 through 1986, the credit limit was increased to $300,000, and in 1987 it was increased to $500,000. These lines of credit were secured by, and limited to the value of, Cascade's accounts receivable and its finished goods inventory.

The improved cash-flow allowed Cascade to pay its officers and to become current on its patent payment obligations under the 1982 agreement at the same time it improved its manufacturing

capability.

The parties stipulated that for the years 1973 through 1983, Cascade reported gross and taxable income in the following amounts:

| Year | Gross Income | Taxable Income |
|------|-------------|----------------|
| 1973 | $203 | ($415) |
| 1974 | 6,704 | 254 |
| 1975 | 49,596 | 10,501 |
| 1976 | 115,296 | 15,232 |
| 1977 | 248,634 | 45,917 |
| 1978 | 519,683 | 42,687 |
| 1979 | 1,033,661 | 169,723 |
| 1980 | 1,546,781 | 165,743 |
| 1981 | 2,266,492 | 286,675 |
| 1982 | 2,791,299 | 356,902 |
| 1983 | 3,935,215 | 414,216 |

The parties stipulated that during the years at issue, Cascade reported gross and taxable income in the following amounts:

| Year | Gross Income | Taxable Income |
|------|-------------|----------------|
| 1992 | $19,921,985 | $2,077,284 |
| 1993 | 22,861,486 | 3,573,098 |
| 1994 | 26,547,637 | 3,285,003 |
| 1995 | 28,921,971 | 3,778,212 |
| 1996 | 31,989,268 | 5,423,024 |

Suspension and Reduction of Patent Payments

In 1987, Cascade determined that a competitor was selling a self-inflating foam-filled mattress that infringed upon its patents. The competitor's mattress was manufactured in Taiwan. After the competitor agreed to discontinue importing and selling the mattress in the United States, the Taiwanese manufacturer

brought an action in Federal District Court seeking a declaratory judgment as to the validity of Cascade's patents. In 1989, Cascade filed a counterclaim against the Taiwanese manufacturer and its U.S. distributor, and a complaint with the International Trade Commission, claiming that the Taiwanese version of the mattress infringed upon Cascade's patents.

In 1990, Cascade and Lea agreed to suspend the corporation's obligation to make payments to Lea pending the resolution of the litigation with the Taiwanese manufacturer. In 1991, at the request of Cascade, the litigation was dismissed. As a result of the dismissal, the Taiwanese manufacturer was allowed to continue manufacturing the mattresses and to sell them in the United States, and Cascade's patents retained their presumption of validity. In 1992, Cascade paid Lea the amounts that had been suspended pending the outcome of the litigation.

The 1982 agreement was amended on three occasions to reduce the amount payable to Lea. Recognizing that the litigation with the Taiwanese manufacturer had weakened, but not invalidated, the patents, Cascade and Lea agreed in November 1992 to reduce the payments from 5 to 4 percent of the gross selling price of the products using the technology covered by those patents. In January 1993, upon reassessment of the value of the patents after the settlement of the lawsuit, Cascade and Lea agreed to reduce the payments from 4 to 2.5 percent of the gross selling price of

the products. Finally, on May 23, 1996, as a result of expiration of some of the patents and the introduction of new technology, Cascade and Lea agreed to reduce the payment percentage to 1 percent of the sales of all products using the technology covered by the patents.

On April 14, 1998, the 776 patent, the last patent included in the 1982 agreement, expired, and no payments were made to Lea under the agreement for products that were sold thereafter. The total amount paid to Lea under the 1982 agreement was approximately $6.5 million.

Petitioners' Reporting Positions and Respondent's Determinations

Cascade deducted the payments to Lea as patent amortization expenses. The Leas reported the payments as capital gains from the sale or exchange of the patents.

In the notice of deficiency issued to Cascade, respondent disallowed the deductions claimed for patent amortization expenses because Cascade had not established that the payments were ordinary and necessary business expenses or were paid to purchase the patents. In the notice of deficiency issued to the Leas, respondent determined that the payments Lea received from Cascade were ordinary income from dividends, rather than capital gains.

OPINION

Issue 1.  Whether the Payments Were for the Purchase of Patents

Cascade asserts that the 1982 agreement is a valid and legally enforceable contract and the amount paid for the patents was reasonable.  Consequently, Cascade argues, the payments are deductible under section 167 as allowances for depreciation of intangible property.[7]

On brief, respondent contends that the 1982 agreement must be disregarded as it was neither fair nor reasonable; rather, it was a mere vehicle to disguise distributions of corporate profits for favorable tax benefits.  Consequently, respondent asserts, any payments made to Lea in excess of the amount provided in the 1979 sales agreement are nondeductible disguised dividends.

---

[7]Sec. 167(a) allows as a depreciation deduction "a reasonable allowance for the exhaustion, wear and tear (including * * * obsolescence) * * * of property used in the [taxpayer's] trade or  business".  Patents constitute intangible property, which may be the subject of a depreciation allowance (amortization) under this section over their useful lives.  See sec. 1.167(a)-3, Income Tax Regs.

Sec. 167(c) (which was designated sec. 167(g) in 1979 and 1982), specifies the basis for depreciation of any property "shall be the adjusted basis provided in section 1011, for the purpose of determining the gain on the sale or other disposition of such property."  Sec. 1012, when read with sec. 1011, provides that the adjusted basis of the property is its "cost".

If the purchase price of a patent is expressed by formula by which a fixed dollar amount cannot be ascertained until future years, such as a purchase price that is a fraction of sales, the purchaser may deduct each year as depreciation only the amount of the purchase price actually paid or payable.  See Newton Insert Co. v. Commissioner, 61 T.C. 570, 581 (1974), affd. per curiam 545 F.2d 1259 (9th Cir. 1976); Associated Patentees, Inc. v. Commissioner, 4 T.C. 979 (1945).

We begin by noting that, as a general rule, respondent's determinations of fact are presumptively correct, and petitioner bears the burden of proving otherwise. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 162(a) allows deductions for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. An "ordinary" expense is one that relates to a transaction "of common or frequent occurrence in the type of business involved", Deputy v. du Pont, 308 U.S. 488, 495 (1940), and a "necessary" expense is one that is "appropriate and helpful" for "the development of the petitioner's business", Welch v. Helvering, supra at 113.

Taxpayers do not have an inherent right to take tax deductions. Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any deduction claimed. See Deputy v. du Pont, supra at 493; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The determination of whether an expenditure satisfies the requirements for deductibility under section 162 is a question of fact. See Commissioner v. Heininger, 320 U.S. 467, 475 (1943); Granberg Equip., Inc. v. Commissioner, 11 T.C. 704, 715 (1948).

Cascade promised in the 1982 agreement to pay Lea more for the patents initially transferred in 1979. We must decide

whether the 1982 agreement is a valid, enforceable modification of the 1979 sales agreement, and if so, whether the amount paid for all the patents was reasonable.  See Champayne v. Commissioner, 26 T.C. 634, 643 (1956) (Court's finding that 5-percent royalty was reasonable did not make contract to pay 20-percent royalty one made in bad faith, a fiction, or a sham).

The 1982 Agreement Is a Valid Enforceable Modification

Default

It is clear from the facts that in 1982 Cascade was in default on its payment obligation to Lea.  The facts do not support respondent's argument on brief that Cascade intentionally defaulted because Lea did not want to be paid.  Lea made repeated demands for payment.  Cascade's failure to meet its contractual obligation was due to excessive demands on its cash-flow from operations and its inability to obtain cost-effective financing to satisfy its unmet cash requirements.

Cascade's decision to use the corporation's available financial resources primarily to build its finished goods inventory and to expand its manufacturing capabilities was a business judgment.  The Court is very reluctant to substitute its judgment for that of the persons operating a company, unless the facts and circumstances require us to do so.  See Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575, 578-579 (1968).

Cascade was an undercapitalized startup company at the time it was delinquent in its payments to Lea. The officers' decisions enabled the corporation to establish its presence in and to secure a share of a rapidly expanding market at the cost of paying more over time for the essential patents. Considering all the facts and circumstances, we are not disposed to second guess these decisions of Cascade's management. See id.

### Written Notice

Furthermore, we find that Lea's failure to provide 60 days' written notice, specifying the default complained of, is without consequence. It is clear from the corporate minutes that the officers had actual notice of the default, and that Lea allowed Cascade many days more than 60 to cure its default, which it did not do. It is also clear that the requirement that written notice be provided was waived by the actions of both parties. See Eggers v. Luster, 200 P.2d 520, 523 (Wash. 1948); Kelly Springfield Tire Co. v. Faulkner, 71 P.2d 382, 384 (Wash. 1937); Barbo v. Norris, 245 P. 414, 417 (Wash. 1926); Consolidated Elec. Distrib., Inc. v. Gier, 602 P.2d 1206, 1210 (Wash. Ct. App. 1979).

### New Consideration

Respondent contends that the 1982 agreement is not valid because Lea provided no new consideration for the contract

modification.  Specifically, respondent asserts that the 776 patent and 750 patent application provided no consideration because the 776 patent was a division of patent application S.N. 800,288 ("Method of Making Self-Inflating Air Mattress"), which was, therefore, assigned to Cascade in 1979, and the 750 patent application was rejected by the U.S. Patent and Trademark Office.

"We recall the first lesson in contracts, the peppercorn theory--that courts will not inquire into the adequacy of consideration so long as it was true and valuable." Pope v. Savings Bank, 850 F.2d 1345, 1356 (9th Cir. 1988).  Here it was. "Adequacy of consideration" is to be distinguished from the legal "sufficiency" of any particular consideration.  Legal sufficiency of consideration is concerned not with comparative value but with that which will support a promise.  King County v. Taxpayers, 949 P.2d 1260, 1267 (Wash. 1997); Browning v. Johnson, 422 P.2d 314, 316, amended 430 P.2d 591 (Wash. 1967).  The relative values of a promise and the consideration for it, do not affect the sufficiency of consideration.  See Browning v. Johnson, supra; Puget Mill Co. v. Kerry, 49 P.2d 57, 64 (Wash. 1935); 3 Williston, Treatise on the Law of Contracts, sec. 7:21, at 383-386 (4th ed. 1992).

We agree that the 776 patent did not provide new consideration.  The 776 patent was a division of patent

application S.N. 800,288, which was assigned by Lea to Cascade in 1979. See <u>Differential Steel Car Co. v. Commissioner</u>, T.C. Memo. 1966-65 (resale of patents by shareholder to corporation provided no new consideration). However, although the 750 patent application did not result in a new patent, it did provide new consideration. See 3 Williston, <u>supra</u> at 393-394 (anything of present or potential intrinsic value, including a new and original idea, can serve as consideration for a promise to pay). Moreover, we find that Lea's waiver of Cascade's breach of the 1979 sales agreement and any claim that he may have had for interest on the unpaid amounts provided legally sufficient consideration for the contract modification. See <u>State v. Brown</u>, 965 P.2d 1102, 1106 (Wash. Ct. App. 1998).

Accordingly, we find that the 1982 agreement was a valid and enforceable modification of the 1979 sales agreement.

<u>Reasonable Payments</u>

Ordinarily, the amounts that a corporation must pay under an agreement for the use of a patent would be deductible in their entirety as ordinary and necessary business expenses, and neither the Commissioner nor the Court would have any authority to rewrite the agreement of the parties. See <u>Thomas Flexible Coupling Co. v. Commissioner</u>, 14 T.C. 802, 818 (1950), affd. 198 F.2d 350 (3d Cir. 1952). But where the party contracting with

the corporation is the majority shareholder, the terms of their agreement may be examined to see whether the amounts to be paid may fairly be regarded as compensation for the use of the patent or represent, to some extent, dividends in disguise.  See id.

Lea was the majority shareholder of Cascade at the time the parties entered into the 1982 agreement.  Transactions between related parties invite close scrutiny.  See Differential Steel Car Co. v. Commissioner, 16 T.C. 413, 424 (1951).  Lea's majority interest alone, however, does not make the patent payments unreasonable.  The agreements under which they were paid will be given effect "if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length."  Sterns Magnetic Manufacturing Co. v. Commissioner, 208 F.2d 849, 852 (7th Cir. 1954); Differential Steel Car Co. v. Commissioner, T.C. Memo. 1966-65.  We must assess the reasonableness of the agreement at the time it was entered into without the benefit of hindsight. See Speer v. Commissioner, T.C. Memo. 1996-323 (citing Brown Printing Co. v. Commissioner, 255 F.2d 436, 440 (5th Cir. 1958), revg. T.C. Memo. 1957-37); see also sec. 1.482-2(d)(2)(ii), Income Tax Regs. ("In determining the amount of an arm's length consideration, the standard to be applied is the amount that would have been paid by an unrelated party for the same intangible property under the same circumstances.").

Expert Witness Reports

Cascade submitted an expert witness report that analyzed the contract terms and amounts paid Lea and concluded that the 1982 agreement was reasonable.  Respondent submitted an expert witness report to rebut the conclusions of Cascade's expert witness.

Expert witness testimony is appropriate to help the Court understand an area requiring specialized training, knowledge, or judgment.  See Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989).  The Court, however, is not bound by an expert's opinion.  We weigh an expert's testimony in light of his or her qualifications and with respect to all credible evidence in the record.  Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject an expert's opinion in its entirety, accept it in its entirety, or accept selective portions of it.  See Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).

Cascade's expert witness identified guideline transactions comparable to the one between Cascade and Lea.  Comparability of the transactions was determined by either similarity of product, similarity of manufacturing process, similarity of markets, or similarity of components and/or technology.  In these guideline transactions, the amounts paid for the patent or process range from 1 to 7 percent of sales, and the mode is 5 percent.

Cascade's expert witness also made certain conclusions regarding the value of the 776 patent and the 750 technology, which were based on an analysis of the cost savings provided by each of their technologies. Petitioner's expert estimated that for the years 1983 through 1996, Cascade's use of both technologies saved direct costs of at least $4.1 million, and the combined direct and indirect cost savings may have been as great as $14.4 million.

Petitioner's expert concluded that comparative industry returns, cost of equity calculations, and an analysis of the guideline transactions indicate that the 1982 agreement was reasonable.

Respondent's expert witness did not consider whether a normal and reasonable rate of payment for the patents was 5 percent of the gross selling price of the covered products during the life of the patent. Respondent's expert witness considered only whether the 776 patent and the 750 technology provided value to Cascade and would support a purchase price of $10 million less the earned but unpaid amounts under the 1979 sales agreement.

In his report, respondent's expert valued the 750 technology at no more than $900,000; however, at trial, he adjusted his analysis and concluded the value was $1.4 million. Respondent's witness did not analyze the value of the 776 patent, because it was not quantified in petitioner's report separate from the 750

technology. Respondent's expert opined that the 1979 sales agreement established the value of the patents at $300,000, and that the only difference between the 1979 sales agreement and the 1982 agreement was the "addition of the '776 patent and '750 application." Accordingly, respondent's expert concluded that "The valuation of the patent and patent application portfolio at December 31, 1982 would, therefore, have differed from the $300,000 valuation under the 1979 Agreement only by the passage of time", and that the value of the patents and patent applications transferred in the 1982 agreement was between $300,000 and $2 million.

We do not find respondent's expert witness' rebuttal persuasive. Respondent's expert relied heavily on a 1983 appraisal of Cascade's stock value to determine the value of the patents. This appraisal was commissioned by Cascade and performed by Management Advisory Services. The appraisal valued Cascade's stock at $2,450,000, including a control premium. Respondent's expert, therefore, concluded the maximum value of the patents and patent applications sold by Lea to Cascade is $2 million; the value "established for the entire company, including all of its technology, patents and applications", less the control premium. Respondent's expert did not consider that the appraised value of the stock was based in part on Cascade's estimated net earnings: its earnings _minus_ the patent payments.

It is clear from the facts that much more than the passage of time entered into the parties' considerations in negotiating the 1982 agreement.  For the years 1973 through 1978, before the parties entered into the 1979 sales agreement, Cascade reported total gross income of $940,116 and total taxable income of $114,176.  For the years 1979 through 1982, the years after the 1979 sales agreement and before the 1982 agreement, Cascade reported total gross income of $7,638,233 and total taxable income of $979,043.  Furthermore, the parties expected the growth rate of the sales, and Cascade's earnings, would continue to increase.

We have found that the 1982 agreement modified the 1979 sales agreement.  Therefore, in deciding whether the 1982 agreement was reasonable, we consider the value of all the transferred patents, not only the 776 patent and the 750 technology.

The market value of the patents and the manufacturing technologies was greater in 1983 than in 1979 simply because the demand for the mattresses had increased dramatically, the cost of manufacturing the mattresses had decreased substantially, and any doubts that the target market would accept a foam-filled self-inflating air mattress were diminished greatly.  In summary, the mattress was a successful product, and the market value of the patents was more evident to Cascade and Lea in 1982 than it was

in 1979.  See Differential Steel Car Co. v. Commissioner, T.C. Memo. 1966-65 (whether payments by a corporation to its controlling shareholder for the purchase of a patent are reasonable depends to a considerable degree on the value of the invention or process and its salability in the open market).

Furthermore, Cascade was not required by the 1982 agreement to pay $10 million for the patents.  Rather, the terms were that Cascade would pay 5 percent of the gross selling price of the covered products, and the total payments could not exceed $10 million.  Cascade was not obligated to pay $10 million unless sales of the covered products totaled $200 million before the patents expired or were supplanted by other patents or technology.  If Cascade had sold no products, it would have paid Lea nothing, and if it had sold more than $200 million of products, it would have paid Lea no more than $10 million.  These terms support a finding that the 1982 agreement was fair and reasonable.  Cf. Differential Steel Car Co. v. Commissioner, T.C. Memo. 1966-65 (contracts that required payment of 80 percent of net sales, which did not consider the possibility of avoidance by competitors or invalidity, were not reasonable).

In fact, the parties adhered to the terms of the 1982 agreement; the payment percentage was adjusted to recognize the decreased value of the patents to the corporation, and Cascade paid Lea substantially less than $10 million.

Moreover, we find no evidence that Lea dominated Cascade's board of directors or the other officers. Rather, the minutes show that all the officers participated in making the corporate decisions, that it was primarily Burroughs' decision as vice president and treasurer whether to pay Lea and the amount to pay him, and that Burroughs negotiated the terms of the 1982 agreement on behalf of Cascade.

The payment percentage, 5 percent of the selling price of the covered products, negotiated by Burroughs is well within the range paid for similar patents and technologies. Burroughs, as vice president, signed the 1982 agreement and testified that at the time the parties entered into the agreement, he thought the agreement was fair and reasonable. We had an opportunity at trial to observe Burroughs and to evaluate his demeanor as a witness. We find Burroughs to be a credible witness, and we are satisfied that his testimony is truthful.

Finally, the evidence shows that the payments to Lea bore no relationship to the percentage of his stock ownership. Cf. Granberg Equip., Inc. v. Commissioner, 11 T.C. 704, 714 (1948) (so-called royalty was payable to the stockholders in almost the same percentage that their stockholdings bore to the taxpayer's total stock).

It is clear from the facts that the patents Lea sold to Cascade in 1979 were very valuable to the corporation, and we

have found that the corporation defaulted on its obligation to pay Lea for those patents. In exchange for Lea's waiving Cascade's prior breaches of the original sales agreement and other consideration, Cascade agreed to modify the terms of the 1979 sales agreement; that is, Cascade promised in the 1982 agreement to pay more for the patents.

In cases like this when the majority shareholder of a corporation is also holder of the patents which are sold to the corporation, "it is easy to say that the transactions were not at arm's length and thus clothe the situation with an aura of suspicion. But we cannot decide cases on suspicion." Differential Steel Car Co. v. Commissioner, 16 T.C. at 424. After closely scrutinizing the transactions at issue, we find the 1982 agreement fair and reasonable, and, therefore, the payments to Lea are expenditures for the purchase of patents, which are deductible as patent amortization expenses.

Issue 2. Whether the Leas May Report the Payments as Capital Gain Income Under Section 1235

The Leas reported the payments Lea received from Cascade as capital gains from the sale of the patents. Respondent contends on brief that even if we find that the 1982 agreement is reasonable, the payments to Lea are ordinary income, not long-term capital gains under section 1235.

Section 1235(a) provides, in general, that a transfer of all

substantial rights to a patent by any holder[8] shall be treated as the sale or exchange of a capital asset held for more than 1 year, regardless of whether or not the payments in consideration of such transfer are contingent on the productivity, use, or disposition of the property transferred. However, section 1235(d), provides: "Subsection (a) shall not apply to any transfer, directly or indirectly, between persons specified within any one of the paragraphs of section 267(b)".

Lea and Cascade are persons specified under section 267(b)(2), as modified by section 1235(d)(1); thus, Lea's sale of the patents to Cascade was a transaction between related persons, and section 1235(a) does not apply to the transaction. See Poole v. Commissioner, 46 T.C. 392, 401-402 (1966).

The Leas assert that even if they are not entitled to capital gains treatment under section 1235, they are entitled under other provisions of the law to capital gains treatment for the payments received for the transfers of the patents to Cascade. The Leas cite section 1.1235-1(b), Income Tax Regs.,[9]

---

[8]The term "holder" includes any individual whose efforts created such property. Sec. 1235(b)(1).

[9]Sec. 1.1235-1(b), Income Tax Regs., provides that if a transfer is not one described in sec. 1.1235-1(a), Income Tax Regs. (transfer of all substantial rights to a patent by a holder to a person other than a related person), then

section 1235 shall be disregarded in determining
(continued...)

and the legislative history of section 1235 in support of their position.

Previously, in <u>Poole v. Commissioner</u>, <u>supra</u> at 404-405, we addressed these same arguments and found them unsound, stating:

> We also find unsound Poole's alternate contention that if section 1235 does not apply to the * * * transfers, he is entitled under other provisions of law to capital gains treatment for the royalties paid in connection with such transfers. The legislative history with respect to section 1235 explains that a holder's recourse to prior case law is proper only when the transaction is not one described in section 1235(a). In other words, if the payments for a patent are contingent upon productivity, use, or disposition, or if they are payable periodically over a period generally coterminous with the transferee's use of the patent, section 1235 is the holder's exclusive provision for qualifying for capital gains * * *. Moreover, this interpretation of the effect of section 1235 is supported by an analysis of the effect of the provisions of the section. If a holder transfers a patent resulting in the payment of royalties in the manner described in section 1235(a) to a related person, and if we were to hold that such a transfer is entitled to capital gains treatment under another provision of law, we would be nullifying section 1235(d). Since section 1235(d) was included in the law, it must have been done for a purpose--the purpose of denying capital gains treatment to a holder's transfer to related persons when the payments are of the type described in section 1235(a). [Fn. ref. omitted.]

---

[9](...continued)
whether or not such transfer is the sale or exchange of a capital asset. For example, a transfer by a person other than a holder or a transfer by a holder to a related person is not governed by section 1235. The tax consequences of such transaction shall be determined under other provisions of the internal revenue laws.

See also <u>Newton Insert Co. v. Commissioner</u>, 61 T.C. 570, 583

(1974) (Court reviewed), affd. per curiam 545 F.2d 1259 (9th Cir.

1976).

In addressing the provisions of section 1.1235-1(b), Income

Tax Regs., we stated:

> We are aware that sec. 1.1235-1(b), Income Tax Regs.,
> provides that if sec. 1235 does not apply because a
> transfer is made to a related person, the tax
> consequences of the transfer are to be determined under
> other provisions of law.  If that section of the
> regulations is intended to imply that when a holder
> transfers a patent and receives payments in the manner
> described in sec. 1235(a), such payments may qualify
> for capital gains treatment, the regulations must yield
> to the contrary legislative purpose.  [<u>Poole v.
> Commissioner</u>, <u>supra</u> at 404 n.7.]

Were we to apply the foregoing case law to the facts of this

case, we would agree with respondent that the Leas are not

entitled to report the proceeds of the sale of the patents as

long-term capital gains.  However, our inquiry cannot end here.

In Rev. Rul. 69-482, 1969-2 C.B. 164, the Commissioner

considered whether a taxpayer-holder who transferred a patent, in

whose hands it was a long-term capital asset, to a related party

for contingent amounts is precluded by reason of section 1235(d)

from obtaining long-term capital gains treatment of the proceeds

of such a transfer under provisions of law other than section

1235.  In his consideration of this issue, the Commissioner

reviewed <u>Poole v. Commissioner</u>, <u>supra</u>, section 1.1235-1(b),

Income Tax Regs., and the legislative history pertaining to the

adoption of section 1235.  The Commissioner concluded that consistent with the legislative history and section 1.1235-1(b), Income Tax Regs.:

> it is the position of the Service that where holders make transfers of patents that do not meet the requirements for capital gains treatment under section 1235 of the Code, the tax consequences of such transfers will be determined under other sections of the Code.
>
>     *     *     *     *     *     *     *
>
>     Therefore, the mere fact that a patent transfer by a holder for contingent amounts does not qualify for long-term capital gains treatment under section 1235 of the Code, will not prevent it from qualifying for such treatment under other provisions of the Code if it would qualify for such treatment in the absence of section 1235.  * * *  To the extent that the rationale of the court in the Poole case may be construed as contrary to the conclusion in this Revenue Ruling it will not be followed.
>
>     Accordingly, the taxpayer in the instant case is entitled to treat the transfer of all substantial rights in the patent as the sale or exchange of a capital asset and the gain therefrom is reportable as long-term capital gain.  [Rev. Rul. 69-482, 1969-2 C.B. at 164-165.]

In previous cases concerning the income characterization of patent payments, the Commissioner has been consistent in adhering to its position in Rev. Rul. 69-482, 1969-2 C.B. 164.  See, e.g., Omholt v. Commissioner, 60 T.C. 541, 547 n.7 (1973) (consistent with his position stated in Rev. Rul. 69-482, supra, the Commissioner made no argument that capital gain treatment is prohibited by section 1235; accordingly, the decision in this opinion was not made on that basis); Chu v. Commissioner, 58 T.C.

598, 608 n.1 (1972) (Government made no argument that the amounts in issue constituted ordinary income solely on the basis that capital gain treatment is not permitted under section 1235 because the taxpayer's ownership of stock exceeded the limits set out in section 1235(d)), affd. 486 F.2d 696 (1st Cir. 1973); Busse v. Commissioner, 58 T.C. 389, 392 n.4 (1972) (Commissioner conceded pursuant to Rev. Rul. 69-482, supra, that the taxpayer-holder was entitled to capital gain treatment of his receipts from the sale of a patent to a related party under sections of the Code other than section 1235), affd. 479 F.2d 1147 (7th Cir. 1973); see also Rev. Rul. 78-328, 1978-2 C.B. 215 (citing Rev. Rul. 69-482, supra); Priv. Ltr. Rul. 83-26-035 (Mar. 25, 1983) (same); Tech. Adv. Mem. 84-21-006 (Jan. 31, 1984) (same).

Except for his argument that the facts of the instant case are distinguishable from the facts in Poole v. Commissioner, supra, respondent has made no argument that Rev. Rul. 69-482, supra, has no application in this case. We find that the essential facts of Poole v. Commissioner, supra, are present in this case, that in the hands of Lea, the patents were long-term capital assets as defined in section 1221, and that the Leas satisfy the requirements of the ruling.[10]

---

[10]We note that sec. 1239(a), I.R.C. 1954 (as amended), requires ordinary income treatment of the gain recognized by the sale or exchange of property to a related person, if the property
(continued...)

Previously, in similar situations, we have treated respondent's position in a revenue ruling as a concession of the issue.  See Walker v. Commissioner, 101 T.C. 537, 550 (1993); Norwood v. Commissioner, 66 T.C. 467, 469 (1976); Merritt v. Commissioner, T.C. Memo. 1995-44; Stalcup v. Commissioner, T.C. Memo. 1995-43; Burleson v. Commissioner, T.C. Memo. 1994-130; Nikkila v. Commissioner, T.C. Memo. 1993-628; Boice v. Commissioner, T.C. Memo. 1993-627; Callison v. Commissioner, T.C. Memo. 1993-626; see also Alumax Inc. v. Commissioner, 109 T.C. 133, 163 n.12 (1997) (although revenue rulings are not regarded as precedent in this Court, as they merely represent the position of the Commissioner on a particular issue, the public generally has the right to rely on positions taken by the Commissioner in revenue rulings), affd. 165 F.3d 822 (11th Cir. 1999); American Campaign Academy v. Commissioner, 92 T.C. 1053, 1070 (1989) (it seems self-evident that in general a taxpayer may rely on a revenue ruling where parallel facts place the ruling in the posture of a concession by the Commissioner as to the analogous taxpayer); Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. 765, 778 (1987) ("The public has a right to rely on positions taken by

---

[10](...continued)
in the hands of the transferee is subject to the allowance for depreciation.  This section is not applicable in the instant case because Cascade and Lea are not related persons as defined under the applicable sections.  See sec. 1239(b) and (c), I.R.C. 1954 (as amended).

the Internal Revenue Service in published revenue rulings. Having made a concession in * * * [the revenue ruling], we believe respondent should be so bound."); ZuHone v. Commissioner, T.C. Memo. 1988-142 (revenue rulings are not authority binding on this Court, but they may, in certain circumstances, constitute an admission or concession by the Commissioner), affd. 883 F.2d 1317 (7th Cir. 1989); see also Rev. Proc. 89-14, sec. 7.01(5), 1989-1 C.B. 814 (taxpayers generally may rely upon published revenue rulings in determining the tax treatment of their own transactions).

It is clear from Rev. Rul. 69-482, supra, that it is respondent's position that the tax consequences of transfers by holders of patents to related persons that do not meet the requirements for capital gains treatment under section 1235 will be determined under other sections of the Code. The ruling has not been revoked, modified, or obsoleted, nor has the law changed. We, therefore, treat respondent's position in Rev. Rul. 69-482, 1969-2 C.B. 164, as a concession that the Leas are entitled to treat the payments as long-term capital gains from the sale or exchange of the patents if they can establish that they meet the factual requirements of the ruling. Since we have found that they meet those requirements, the Leas are entitled to long-term capital gain treatment of all the patent payments in issue.

To reflect the foregoing,

<u>Decisions will be entered for petitioners</u>.